UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
                                                                   :
RAFAEL BILD,                                                       :      09-CV-5576 (ARR) (VVP)
                                                                   :
                              Plaintiff,                           :      OPINION AND ORDER
                                                                   :
              -against-                                            :
                                                                   :
ABRAHAM WIEDER,                                                    :
                                                                   :
                              Defendant.                           :
                                                                   :
----------------------------------------------------------------- X

ROSS, United States District Judge:

Plaintiff Rafael Bild ("Bild" or "plaintiff") commenced this action against defendant

Abraham Wieder ("Wieder" or "defendant") in 2009, seeking to recover millions of dollars in

principal and interest on an alleged $3 million loan he made to Wieder in 1998. While the

parties dispute the exact amount of the loan, Wieder concedes that he received at least $2.7

million and admits that he never made any repayments on the loan.

Nonetheless, Wieder maintains that Bild's suit is barred by New York's six-year statute

of limitations for actions sounding in contract. In turn, Bild claims that Wieder should be

equitably estopped from asserting the statute of limitations defense. Specifically, Bild alleges

that Wieder lulled him into postponing suit through an extended series of misrepresentations that

plaintiff would be repaid without litigation. Notwithstanding his heavy burden, the court

concludes that plaintiff has proven all the elements of equitable estoppel and that Wieder is

therefore precluded from asserting the statute of limitations defense. The court moreover finds

that Wieder is liable for the entire $3 million loan.

Bild's claims were tried before this court during a bench trial held on April 15 and 16,

1

2013. Both parties testified at the trial. Non-party witness Pincus Friedman ("Friedman"), a close, long-standing friend of both plaintiff and defendant, also testified. In addition, plaintiff relied on excerpts from the deposition testimony of Michael Konig ("Konig"), Wieder's former co-defendant whom the court dismissed from this case upon reconsideration of its summary judgment order. Dkt. #224. Through various agreements with Wieder after 1998, Konig allegedly agreed either to repay or indemnify Wieder for Bild's loan. Plaintiff likewise relied on deposition testimony excerpts from Abraham Roth, the accountant for both Wieder and Konig who arbitrated the issue of which client must repay Bild's loan. Wieder submitted counter-designations from both depositions. The depositions of both Konig and Roth were videotaped, thus allowing the court to take into consideration the witnesses' demeanors in assessing their credibility. Defendant also relied on excerpts from the deposition testimony of Michael Glinsky, Bild's accountant, in response to which plaintiff submitted counter-designations. Finally, the parties submitted a variety of documentary evidence as trial exhibits.

In general, the court finds Bild's testimony highly credible with respect to the funding of the loan; representations made to him by Wieder, Friedman, and Roth regarding repayment of the loan; and plaintiff's reliance on those representations. While Bild understandably does not recall all the details concerning his conversations with Wieder, Friedman, and Roth throughout the lengthy period between 1998 and 2009, his overall testimony concerning the import of those conversations, as well as their effect on his state of mind, was consistent, convincing, and persuasively corroborated by his demeanor. Plaintiff's trust in Wieder with respect to the loan and repayment made a particularly strong impression on the court; plaintiff bore little resemblance to the calculating and "sophisticated business man," Dkt. # 246, at 6, whom defendant has attempted to depict.

By contrast, the court finds Wieder to be considerably less credible than Bild. In particular, the court has substantial doubts about Wieder's testimony concerning his representations and omissions to Bild regarding repayment of the loan, as well as the motivations underlying these representations and omissions. Wieder's explanations strained credulity at critical junctures and demonstrated defendant's willingness to use deception to achieve his objectives. Although logically inconsistent at times, defendant's statements were strikingly uniform in one respect: their self-serving nature.

In addition, the court finds Friedman to be a reluctant witness placed in a difficult position due to his close relationships with both parties. While Friedman's testimony credibly corroborated Bild's account for the most part, it at times varied from the statements in his affidavits. When those inconsistencies did arise, they were distinctly colored by what the court finds to be Friedman's closer relationship with Wieder. When confronted with those inconsistencies, Friedman abandoned the variations he introduced at trial and confirmed the truth of the statements set forth in his affidavits.

The court further finds Roth's deposition testimony to be generally truthful albeit often vague. It is understandable that Roth has an incomplete recollection of events that transpired years ago. At the same time, although Roth's testimony did not appear to be biased toward either party, his testimony was evasive at times, reflecting what the court finds to be the arbitrator's desire to protect himself from potential liability with respect to representations made to Bild about the arbitration.

Finally, the deposition testimony of Konig and Glinsky did little to refute Bild's overall account of repeated misrepresentations by Wieder regarding repayment of the loan and of plaintiff's reasonable reliance on those misrepresentations.

3

Based on the evidence received at trial, the court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Bild's Introduction to Wieder and Decision to Make the Loan

In the late 1990s, Wieder became involved in a Brooklyn real estate venture known as Vanderveer Estates Holding, LLC ("Vanderveer"). Tr. 303. During that time, Wieder borrowed $4 million from Konig to invest in the project. Id. In 1998, Wieder also sought to buy out two of his partners in Vanderveer, but lacked the funds to do so. Id. at 205-06, 304. Defendant thus informed Friedman of his desire to buy out his partners' shares and of his need to raise money for that purpose. Id. at 205-06. Subsequently, Friedman introduced Bild to Wieder as a potential funder for the buyout. Id. at 206.

At trial, Friedman testified that he has been close friends with both Bild and Wieder. Id. at 198, 200. In 1998, Friedman had already known Bild for several years, having met plaintiff through the jewelry business earlier in the 1990s. Id. at 197-98. Friedman worked as a salesman for a jewelry company and would sell jewelry to Bild's company from time to time. Id. at 37, 197-98. The two developed a very close personal friendship, pursuant to which Friedman visited Bild in Florida, Bild visited Friedman in New York, and Bild attended the bar mitzvahs of two of Friedman's children. Id. at 38, 198-99. As Bild explained at trial, "I think we became very good friends. He was very sincere. We were very different, you know, he being orthodox and I'm being nonorthodox. We found something in each other to make ourselves very close." Id. at 38.

Notwithstanding his close friendship with Bild, I find that Friedman had an even closer relationship with Wieder, whom he has known for most of his life, id. at 254. As of 1998, Friedman had already known Wieder for about fifteen years. Id. at 200. In addition to being

4

"very close friends," the two were closely affiliated within the same religious community. Id. at 200-01. For many years, Friedman and Wieder attended synagogue together, where they prayed alongside each other every morning. Id. at 200. Friedman also assisted Wieder with work within their community, such as projects involving the synagogue and yeshivah. Id. at 200-01. In addition, Friedman has worked with Wieder for the past ten years. Id. at 254. Specifically, Friedman is an employee of a company owned by Wieder and, in this capacity, sees Wieder on a regular basis. Id. at 196.

Prior to the parties' first meeting, Friedman described Wieder to Bild as a "very close friend" and as a successful, trustworthy, and devoutly religious individual. Id. at 39. Friedman also characterized Wieder as "a very wealthy individual and a very shrewd businessman" with experience in the diamond, pharmaceutical, and real estate businesses. Id. In addition, Friedman said that Wieder "owned a lot of property in New York and in Israel," id. at 40, and provided an example of Wieder's success by mentioning defendant's sale of a company for $20 or $30 million, id. at 39. Plaintiff further recalled, "He said he was very honest man, everybody loved him in the community and he said he was a very religious man. He went to his synagogue with him in the morning, in the evening. He was very successful and gave to charity. Just all good compliments." Id. at 41.

Bild's first meeting with Wieder reinforced Friedman's positive portrayal of defendant. As Bild recalled, "I had very good impression. He seemed like a very warm person, very sincere, very trustworthy . . . . [H]e told me about all his projects and his dealing and all his buildings in Israel, what he was doing there. I was very impressed." Id. at 43. In addition, the meeting took place in Wieder's home, which Bild perceived to be "very beautiful," "huge," and decorated with "a lot of artwork." Id. at 43. Bild testified that Wieder's home further

5

strengthened plaintiff's belief that defendant was a man of substantial financial means. Id. The court credits Bild's testimony that he had a strongly favorable impression of Wieder based on both Friedman's representations and his own initial encounter with defendant.

At their second meeting, Wieder brought up Vanderveer for the first time and brought Bild to see the development. Id. at 43-44. According to plaintiff, Wieder described Vanderveer as a sound investment: the property was subsidized by the government, therefore guaranteeing a "very steady income"; it would require little maintenance by Wieder; and it would "appreciate in price very quickly," generating a substantial amount of rental income once all the units were filled. Id. Thereafter, Wieder informed Bild that he needed a loan of $3 million to buy out his partners in Vanderveer, and Bild decided to make the loan. Id. at 44-45.

Reflecting on his decision to loan Wieder the money, plaintiff testified that he "was very impressed with the project." Id. at 45. Moreover, Bild recalled, Wieder told plaintiff that "he ha[d] just sold his company to this Canadian company for so many millions, almost $30 million, and he put all his money into this project." Id. Bild was impressed by Wieder's willingness to invest such a large sum of his own money in Vanderveer and "didn't see anything negative about it, just everything positive." Id. However, plaintiff apparently did not know that Vanderveer was at the time embroiled in litigation over the lock-out of over forty union workers formerly employed at the project site, Tr. 363-64; see Bevona v. Vanderveer Estates Holding, Nos. 98-9529, 99-7049, 99-7179, 1999 U.S. App. LEXIS 7778 (2d Cir. Apr. 7, 1999)—the beginning of a chain of events that would eventually lead to Wieder's loss of Vanderveer and conviction for conspiring to commit labor bribery. Tr. 365-69; United States v. Aparo, No. 01-cr-00416 (E.D.N.Y. 2001).

The court credits Bild's testimony that he viewed Vanderveer as a sound investment

backed by someone whom he perceived to be a successful, experienced, and trustworthy businessman. See Tr. 155-56. Notably, Wieder testified that Bild never asked him for "anything related to the financial business or finances of the project" and never requested to see "any bank accounts, bank statements, or financial statements." Tr. 358-59. Bild's willingness to loan Wieder such a large sum of money—after only two meetings with defendant and without taking any steps to verify the financial soundness of the project—can be explained only by his high degree of confidence in Wieder, for whom plaintiff's close friend Friedman had so strongly vouched.

**B.     The Loan Documents**

On December 31, 1998, Bild, Wieder, and Vanderveer entered into a loan agreement ("Loan Agreement"), Pl.'s Ex. 2, pursuant to which Weider executed a promissory note ("Note") in favor of Bild in the principal amount of $3 million dollars, Pl.'s Ex. 1. The Loan Agreement provided that interest on the loan would accrue at an annual interest rate of eleven percent. Pl.'s Ex. 2, at 1. The first annual interest payment of $330,000 would be due on December 31, 1999. Pl.'s Ex. 1, at 1; Pl.'s Ex. 2, at 1. According to the Note, interest would accrue upon default at an increased fifteen percent annual rate. Pl.'s Ex. 1, at 1.

With respect to when the principal balance would be due, the Loan Documents referenced only two events: (1) the sale of Vanderveer, upon which "all sums due to Lender hereunder shall be due and payable" and Bild would be entitled to ten percent of the net profits from the sale, Pl.'s Ex. 2, at 2; and (2) default, upon which "Payee, at its sole discretion, may declare the entire outstanding principal balance of this Note, together with all interest accrued and unpaid thereon, to be due and payable," Pl.'s Ex. 1, at 1.

On the same day, Wieder and Vanderveer also entered into an agreement with Bild under

7

Jewish religious law entitled "Shtar Iska," "An Agreement Concerning Interest and Loans." Tr.

309; Pl.'s Ex. 3. The Shtar Iska states, "We, the undersigned, have received from Raphael Bild

('Lender') the sum of $3,000,000.00, repayable according to a certain Note and Agreement made

this date, for the purpose of transacting business in connection with Vanderveer Estates." Id. at

1. The document further acknowledges, "We have received a token payment of $1.00 from the

Lender for our efforts in connection with this undertaking, and have signed a Note and Loan

Agreement evidencing the receipt of the said $3,000,000." Id.

**C.      Bild's Funding of the Loan**

The court credits Bild's testimony that he funded the entire $3 million of the loan before

the parties signed the Loan Documents on December 31, 1998. See Tr. 51. Notably, Wieder has

no independent recollection of receiving anything less than $3 million. Id. at 311. Nonetheless,

Wieder maintains that he may have received only $2.7 million. Id.

As an initial matter, Bild candidly admitted that he did not report to the Internal Revenue

Service ("IRS") the income that he used to fund the loan. Id. at 135. Plaintiff's admission is

corroborated by his tax returns for 1998 and 1999, which do not reflect sufficient income to

support a $3 million loan. Def.'s Exs. E, F. Nor did Bild report to the IRS the two foreign

corporations that he used to fund a portion of the loan—corporations of which Glinsky, who

prepared Bild's 1998 and 1999 tax returns, Def.'s Ex. G., at 25-29, was unaware. Id. at 38-40;

Def.'s Exs. E, F.

Namely, plaintiff testified that he funded $1.6 million of the loan through a wire transfer

from Commercial Consultants Ltd. ("CCL"), an Israeli company that he owned. Tr. 52. Bild

had established CCL based on Wieder's advice, id. at 53, and it was actually Wieder's

accountants in Israel, Zan Gainesford and Brian Bell, who had set up the corporation for

8

plaintiff, id. at 55-56; Pl.'s Ex. 5. CCL had an account located in the Mizrahi Bank in Tel Aviv,

Israel, and Wieder advised Bild to transfer money for the loan from this account. Tr. 53.

Plaintiff introduced into evidence a December 31, 1998 Payment Order for $1.6 million from the

Mizrahi Bank to an attorney trust account belonging to Wieder's attorney, Silberberg. Pl.'s Ex.

4.

Bild further testified that the money in CCL's account came from Hampton International

("Hampton"), a Liberian corporation that Bild formed in the 1990s. Id. at 133-34. Bild averred

that he could not recall how he funded the Hampton account, but indicated that some of the

money may have come from his jewelry business in New York and some of it may have come

from an account in Switzerland owned by his parents. Id. at 133. When questioned by defense

counsel, Bild readily admitted that he sent funds from his business to Hampton that were not

reported to the IRS. Id. at 134. Wieder does not contest receiving the $1.6 million that Bild first

sent from Hampton to CCL, and then from CCL to Silberberg.

Bild next testified that he funded the remaining $1.4 million of the loan through cash,

money orders, and checks. Tr. 51. It is the exact amount of this portion of the loan that Wieder

challenges. Plaintiff explained that he sent the $1.4 million in increments either directly to

Wieder or through Friedman. Id. at 59. Friedman confirmed that he had helped to deliver

envelopes of money to Wieder, id. at 259-61, and Wieder also recalled receiving the money in

"drips and drabs," id. at 361. Defendant admitted that he did not actually remember receiving

less than the full $3 million. Id. at 311. Although Wieder claimed to have received between

$2.7 and $3 million, he acknowledged that this estimate was based solely on Roth's 2005

inspection of Bild's loan documentation. Id. at 310-11.

Specifically, Roth traveled to Florida in 2005 to verify the validity of Bild's loan to

9

Wieder. Id. at 93-94; Pl.'s Ex. 18, at 74-75. As part of this process, Roth and Bild visited the

safe deposit box in which Bild kept his copy of the Loan Documents. Tr. 95; Pl.'s Ex. 18, at 74.

According to Roth, "it was a safe that hasn't been opened for many years, since around the time

when this loan was made." Id. at 75; Pl.'s Ex. 7; accord Tr. 91. Bild recalled that he showed

Roth not only the Loan Documents, but also documentation of the wire transfer from Mizrahi

Bank and "the tapes from the adding machine for all the postdated checks and the money orders

and cash that was sent to Mr. Wieder." Id. at 95. Plaintiff's testimony is supported by Roth's

acknowledgment that he saw "a wire and various overnight shipments, two-day shipments . . . of

sums of money that totaled almost [$3 million dollars]." Pl.'s Ex. 18, at 75, accord id. at 87-89.

At trial, plaintiff credibly testified that he had inadvertently discarded these documents while

undertaking an extensive cleanout of his storage facilities during the summer of 2008; Bild

recalled that he "threw hundreds of boxes of documents," which accidentally included the box

containing his copy of the Loan Documents and various receipts. Tr. 164-65.

     Bild and Roth provided conflicting testimony regarding the exact amount evidenced by

plaintiff's various receipts. Bild averred that the sum was short by only two or three thousand

dollars, id. 95, whereas Roth recalled that it was off by $200,000 to $300,000, Pl.'s Ex. 18, at 75,

102. The difference is immaterial, however, insofar as the court credits plaintiff's testimony that

he did, in fact, provide the full $3 million to Wieder. See Tr. 51. Moreover, given the piecemeal

way in which plaintiff funded the $1.4 million portion of the loan, it is unsurprising that he may

have misplaced one or more pieces of documentation when assembling the contents of the safe

deposit box.

     Plaintiff's statement that he fully funded the loan is corroborated by Wieder's express

acknowledgment in the Shtar Iska that defendant received the full sum. Pl.'s Ex. 3, at 1. It is

also supported by Wieder's admission that he never told plaintiff that he did not receive the
entire $3 million. Tr. 312. Likewise, Wieder never mentioned to Friedman that he received
anything less than the full amount. Id. Referring to the payments that he helped deliver to
Wieder, Friedman also testified, "[A]t one point everybody was happy. [Bild] has finished
sending, [Wieder] was happy receiving." Id. at 261. Furthermore, the parties agree that the
Loan Documents were amended on July 20, 1999, to change Bild's share of the profits in
Vanderveer from ten percent to thirteen percent. Pl.'s Ex. 6. Had Wieder not received the full
$3 million by then, it is difficult to believe that he would have conceded to this amendment
without insisting that the principal balance be modified to reflect an amount less than $3 million.
This is particularly so given Wieder's testimony that he was "under pressure" to obtain the
money at the time. Tr. 359. In light of Wieder's admitted need for the money, I am skeptical
that he would have accepted without objection anything less than the full amount.

In sum, Wieder's lack of recollection regarding whether he received the full $3 million,
and Roth's deposition testimony that he saw evidence of only $2.7 or $2.8 million during his
2005 inspection of Bild's safe deposit box, are insufficient to defeat the substantial evidence that
Bild did, in fact, fund the loan in its entirety.

**D.    Wieder's Default and Reassurances of Repayment**

In 1999, the Second Circuit issued a decision that required Wieder to reinstate the union
workers who had been locked out from Vanderveer. Tr. 362; see Bevona, 1999 U.S. App.
LEXIS 7778. As a result of the union's demand for back pay and fees, Wieder became liable for
"millions of dollars." Tr. 364. In addition, defendant had to hire a second staff for Vanderveer,
because the reinstated union workers "did nothing." Id. at 373.

Consequently, Wieder testified, he "didn't have any cash" and defaulted on the first

11

payment due to Bild on December 31, 1999. Id. at 372-73; accord id. at 64. A couple of months later, Bild called Friedman and told him that he needed the payment. Id. Wieder responded by saying that he would pay Bild "very soon." Id. Bild testified that he spoke with Wieder "many times" in 2000 to follow up about repayment of the loan. Id. at 69. According to Bild, "Mr. Wieder always said, I am busy, I'm working on a deal, I have to go to Israel, you will get paid soon, I'll pay you this, don't worry." Id. at 68. Bild further recalled, "Mr. Friedman always reassured me not to worry, that Mr. Wieder was a very wealthy man, he had a lot of assets, buildings, he was a sincere man, he was a very religious man. He reassured me that I had nothing to worry." Id. at 70.

As Bild explained, because Wieder was very difficult to reach by phone, the parties usually communicated about the loan through Friedman. Id. at 65. Friedman confirmed Bild's characterization of these communications, testifying that he had "many conversations" with Wieder and Bild regarding repayment of the loan. Id. at 213. In addition, Friedman explained that Wieder not only gave him permission to speak to Bild about this topic, but also requested that Friedman "convey information to Mr. Bild about what was going on with the repayment." Id. at 214. During his cross-examination, Wieder affirmed the accuracy of "Friedman's testimony . . . about basically being an intermediary, carrying messages between [Wieder] and Mr. Bild." Id. at 375. The court therefore credits Friedman's testimony that when he spoke to Bild about the loan and repayment, he did so at Wieder's request "[m]ost of the time,"[1] id. at

---

[1] The partial telephone records submitted by plaintiff show only thirty-eight outgoing calls from Bild to Wieder's home and cell phone numbers between 1999 and 2009, Pl.'s Ex. 20; Tr. 301-02. However, plaintiff has offered a credible explanation for the seeming discrepancy between his partial telephone records and his testimony regarding the frequency with which he spoke to Wieder regarding repayment of the loan. As discussed, Bild, Friedman, and Wieder all testified to the effect that Friedman served as an intermediary between the parties, Tr. 65, 100, 213, 214, 376, and plaintiff's telephone records document 876 outgoing calls from plaintiff to Friedman between 1999 and 2000, Pl.'s Ex. 20. Furthermore, plaintiff's partial telephone records do not reflect any incoming calls received by plaintiff and thus do not show any of the times that Wieder called Bild in response to Bild calling Friedman. Id. at 65, 100. The court credits plaintiff's testimony that when he spoke with Wieder, it was through this arrangement

214.

Bild testified that he believed the reassurances that he received from Wieder and

Friedman. Id. at 69-70. As plaintiff explained, "This is a busy man, you know, he had big

projects. He got many buildings in New York. He's doing many buildings in Israel, always

travelling. . . . I believed him. I thought he was an honest man, sincere[,] . . . [h]ard working."

Id. at 69. The court is convinced that Bild did, in fact, believe that Wieder would repay him.

Thereafter, Wieder failed to make the second payment due under the loan on December

31, 2000. Id. at 70. Bild testified that he followed up in 2001 by having "many conversations,"

both in person and over the telephone, with Wieder regarding repayment. Id. at 71. Some of the

in-person discussions took place when Bild came to New York for trade shows, and Bild also

recalled meeting with Wieder and Friedman in kosher restaurants on the East Side and in the

Marriott and Gansevoort hotels.[2] Id. at 71-73. Friedman corroborated plaintiff's testimony,

averring that he was present for the restaurant and hotel meetings. Id. at 251.

During their many conversations in 2001, Bild testified, Wieder averred that he was busy

but that plaintiff had nothing to worry about because Wieder was "working on something" and

would pay him soon. Id. at 71. Specifically, Bild recalled, "I think perhaps that's the time when

he said he had some legal issues, . . . he had to just concentrate on something he was doing for a

legal issue, to please allow him some time but that he would pay me." Id. Wieder corroborated

Bild's testimony, recalling, "I told him at that point I was sure that I will pay him off very soon

everything because . . . it looked like any day we're finishing a deal to get over seven million

---

"[m]ost of the time," id. at 100. Although Friedman could not provide a numerical estimate for the times he spoke
to Bild, Friedman confirmed that he did so frequently and explained that many of their conversations related to the
loan repayment issue. Id. at 213, 264-65. With respect to all the communications referenced in this opinion that
Friedman made to Bild regarding the loan and repayment, the court finds that they were undertaken at Wieder's
request.
[2] Bild clarified that the meetings in the Gansevoort Hotel took place in 2002 or 2003 rather than 2001. Id. at 73.

dollars. I can pay off the whole loan and have no problem." Id. at 373.  In addition, Friedman

allayed Bild's concerns, assuring plaintiff that Wieder, who was trustworthy, religious, and well-

regarded in his community, "would make good on it." Id. at 74.  Looking back, Bild testified

that he believed the reassurances from Wieder and Friedman. Id.  As plaintiff explained,

> I thought he was a very wealthy man with a lot of assets in Israel, in New York. I
> knew he had these project worth close to [$]80, $90 million. His home. There's
> no reason not to believe him. He was very sincere. He just say, give me some
> time, I have some legal issues you know, don't push me now, I take care of it,
> once this is done, you will be paid, don't worry.

Id.  The court credits Bild's testimony that he believed that Wieder was temporarily

occupied with legal issues, and that there was no doubt in plaintiff's mind that payment

would be forthcoming given Wieder's seemingly abundant assets. See id.

**E.     The March 2001 Agreements and Wieder's Further Reassurances of Repayment**

Defendant confirmed that he was beset by legal troubles during this time. Id. at 362-68,

373.  After Wieder was compelled to rehire the union workers at Vanderveer in 1999, he became

involved in discussions to "bring in a company and lock [the union] out again." Id. at 365.

Wieder's attendance at a meeting on this subject led to his indictment for labor bribery in 2001.

Id. at 365-66.  During this period, Wieder approached Konig for help, and Konig took Wieder to

a man named Steve Rosenberg ("Rosenberg"). Id. at 368.  Wieder testified that Konig and

Rosenberg "started negotiating for buying the property and leaving [Wieder] with a small

percentage, but giving [him] enough money to pay everybody." Id.; accord id. at 317.  However,

the negotiations became increasingly unfavorable for Wieder, and eventually defendant said,

"[A]t least give me an indemnification for everything." Id. at 368-69.

In March 2001, Wieder and Konig entered into a series of agreements ("March 2001

Agreements") pursuant to which defendant transferred the entirety of his ownership interests in

14

Vanderveer to Konig; in exchange, Konig agreed to indemnify Weider against "any and all loss and expenses . . . that may be suffered by [Wieder] as a result of or in connection with his previous ownership interested in [Vanderveer]." Pl.'s Ex. 15; Pl.'s Ex. 16. Notably, however, Wieder never disclosed Bild's loan to Konig. Tr. 319, 385; Pl.'s Ex. 12, at 139. While the March 2001 Agreements explicitly mention another liability, that is, "any personal liability to GMAC," Pl.'s Ex. 16, for which Konig would indemnify Wieder, they nowhere mention Bild's loan.

Subsequently, Wieder failed to pay the third installment due on December 31, 2001. Tr. 75. Wieder's troubles escalated in 2002, when he was convicted of the felony of labor bribery and sentenced to six months of home confinement and four years of probation. Id. at 307. Nonetheless, the parties continued to have many conversations that year, both in person and by telephone, during which Wieder reassured Bild of repayment. Id. at 75. Friedman, at Wieder's request, id. at 214, 376, also spoke with Bild frequently regarding the loan and continued to reassure plaintiff that he had "nothing to worry about." Id. at 76. When questioned why he continued to believe Wieder and Friedman, Bild credibly testified that he believed that defendant was a "very sincere man" and was "working on" getting plaintiff repaid. Id. at 76. The court credits plaintiff's testimony that he believed that Wieder, who owned "a lot of property," id., was working on a transaction that would allow him to repay Bild. See id.

In 2002 or 2003,[3] Wieder further allayed Bild's concerns by referencing the March 2001 Agreements during several conversations with plaintiff. The court credits Bild's testimony that Wieder—despite having obtained only an indemnification agreement from Konig—asserted that

---

[3] Although Vanderveer went into bankruptcy in 2003, Bild was neither informed of the bankruptcy nor listed on the schedule of creditors. Id. at 79; Pl.'s Ex. 13. At the same time, Wieder testified that he was no longer involved with Vanderveer at this point and had nothing to do with the bankruptcy. Id. at 322. There is no evidence in the record to contradict Wieder's testimony on this point.

15

Konig had agreed to pay Bild's loan if defendant was unable to do so himself. See id. at 77. That Wieder was less than candid with plaintiff regarding the March 2001 Agreements is supported by defendant's knowing failure to disclose Bild's loan to Konig in the course of entering into those agreements. In addition, Bild's testimony is corroborated by Friedman, who averred that Wieder made the same representations to him about the March 2001 Agreements; specifically, Wieder claimed that Konig had agreed to "take care of" any outstanding debts relating to Vanderveer. Id. at 213. Accordingly, Friedman, who spoke with plaintiff "[v]ery often," id. at 78, during this period—again, upon Wieder's requests, id. at 214, 376—reassured Bild that he would be repaid pursuant to the March 2001 Agreements. Id. at 78.

Although Wieder claims that he merely told Bild that he "hoped" to get plaintiff paid through the "blanket indemnification" set forth in the March 2001 Agreements, id. at 319, the court finds defendant's testimony to be not credible. The court is hard-pressed to believe that Bild would have been pacified by Wieder's mere "hopes" that plaintiff would be repaid. Moreover, Wieder's testimony is contradicted by not only Bild's account, but also the testimony of Friedman—who had no motive to lie in a way that disfavored Wieder, given Friedman's closer relationship with defendant. Accordingly, the court rejects Wieder's account and finds that defendant purposely mischaracterized the March 2001 Agreements to plaintiff. In addition, the court credits Bild's testimony that he believed, based on Wieder's and Friedman's representations in 2002 and/or 2003, that he was guaranteed repayment based on the March 2001 Agreements. See id. at 78.

**F.    Wieder's Representations Regarding the Arbitration**

In early 2004, Bild became concerned that he had yet to be repaid. Id. at 81. Plaintiff therefore informed Wieder that he was considering hiring an attorney and possibly suing him.

16

Id. at 81. In response, Wieder asked plaintiff to "give him a couple more months," saying that he would "work it out." Id. When those two months elapsed and no payment was forthcoming, Wieder approached plaintiff and dissuaded him from hiring an attorney, insisting that Konig had already signed a contract obligating him to repay Bild in the event that defendant was unable to do so. Id. at 82.

In addition, plaintiff testified that Wieder urged him to allow defendant and Konig to arbitrate the issue of the loan repayment. Id. Friedman, moreover, averred that he spoke with plaintiff "on a constant basis" during the months between when Wieder told him that there would be an arbitration and when the arbitration actually commenced, id. at 217; on multiple occasions in the months preceding the arbitration, Friedman testified, he complied with Wieder's requests "to please let Mr. Bild know that there was going to be an arbitration," id. at 218-19.

Wieder informed Bild that Roth, who served as the accountant for both Wieder and Konig, would arbitrate the dispute between his two clients. Id. at 84. Defendant spoke at length of Roth's qualifications, representing Roth as a highly experienced and regarded arbitrator who "had a very large firm of accountants with dozens and dozens of people working for him." Id. As Roth confirmed in his deposition, he had, indeed, presided over "[p]robably about 30, maybe even more" formal arbitrations. Pl.'s Ex. 18, at 10. Wieder also told Bild that Roth was an extremely fair and religious man who was "very well-respected in the community." Tr. 84.

Wieder moreover told plaintiff that "he had given Mr. Roth some tax write-off credits to give to Konig in exchange for [Bild] getting paid promptly according to the contract they had [i.e., the March 2001 Agreements]." Id. Wieder claimed that "there were so many millions" in tax write-off credits "that the payment to [Bild] would have been nothing compared to that." Id. As Konig subsequently explained in his deposition, however, although the tax losses amounted

17

to approximately $5 to $10 million, "only a percentage of the loss is . . . attributable to one's return. It's not that you're putting pure dollars into your pocket." Pl.'s Ex. 12, at 193-94. The court finds that Wieder exaggerated the value of his tax losses as a strategy for securing Bild's consent to the arbitration.

This finding is consistent with Wieder's admission that he told plaintiff that arbitration was the "only" way to guarantee Bild repayment and "would be better than going to court." Id. at 323. Indeed, defendant insisted, "We have no choice but to go to arbitration because of the way the money was funded."[4] Id. at 327. In addition, Bild credibly testified that Wieder told him that an arbitrator would have the "legal power to get [him] paid," id. at 85, through a binding decision that could not then be challenged before another arbitrator or before a court, id. at 82.

At the same time, Wieder represented that the one principal obstacle standing in the way of a favorable award to Bild was as follows: Konig was challenging the existence of the loan, and an arbitrator would be "the only one that would go down and look at pieces of papers" to confirm that Bild had actually funded the loan. Id. at 322-23. Significantly, Friedman testified, and defendant confirmed, id. at 323, that Wieder asked him to communicate to Bild that the main purpose of the arbitration was "to prove the funds"—that is, to determine whether or not "it was a real loan," id. at 219. The clear implication of these communications, the court finds, was that

---

[4] Wieder elaborated at trial, "You know you can't go to court with cash and with all this stuff. How are you going to deal with it?" Id. at 323. Defendant also explained, "[The arbitrator] has to go down and look at pieces of paper and make decisions on cash. . . . I said in court it wouldn't be possible to deal with this." Id. at 326-27. It is somewhat unclear whether Wieder was alluding to the piecemeal way in which Bild funded the loan through wire transfers, cash, money orders, and checks, or to Bild's failure to report to the IRS the income that he had used to fund the loan. To the extent that Wieder meant the former, the court finds it difficult to understand why a court would be less capable than an arbitrator of making an evidentiary determination as to whether Bild funded the loan. To the extent that Wieder meant the latter, this appears to be a post-hoc explanation that defendant has adopted in accordance with his evolving legal defense in this case. Notably, Wieder never mentioned plaintiff's tax improprieties in his deposition when explaining the purported benefits of arbitrating rather than litigating the dispute. Instead—just as Wieder admittedly based his claim that Bild did not fully fund the loan on Roth's statements rather than his own memory, id. at 311—it appears that Wieder may have derived his belated focus on Bild's tax problems from Roth's deposition testimony that Bild seemed to have funded the loan through "under the carpet money" on which taxes had not been paid, id. at 430.

Bild would be repaid once an arbitrator made a factual determination that plaintiff had indeed

loaned Wieder $3 million.

On direct examination, Friedman was questioned, "Did Mr. Wieder tell you at that

time—and again we're talking about 2004—what would happen if the arbitrator determined that

indeed the loan was real?" Id. at 219-20. Friedman then responded, "Hopefully Rafael would

get paid." Id. at 220 (emphasis added). Friedman repeated this testimony multiple times. Id. at

220, 226, 227. However, plaintiff's counsel subsequently confronted Friedman with his

February 3, 2012 affidavit, and the following exchange occurred:

> Q   Referring to paragraph 8, you said in your affidavit that Mr. Wieder told
>     you that once Mr. Roth confirmed the validity of Mr. Bild's loan Mr.
>     Konig would repay it? Those are your words, aren't they?
> A   Yes.
> . . . .
> Q   Did I understand you to say that once Mr. Roth confirms the loan then Mr.
>     Konig will repay it?   That's your testimony?
> A   Yes.
> . . . .
> Q   Now, isn't it true that Mr. Wieder asked you to tell that to Mr. Bild on a
>     number of occasions? In other words, to tell Mr. Bild that if the arbitrator
>     finds the loan is real Mr. Konig will repay it?
> A   Yes.
> Q   So Mr. Wieder asked you to tell that to Mr. Bild and you did, right?
> A   Yes.
> Q   At Mr. Wieder's request, right?
> A   Yes.
> Q   Many times, right?
> A   Yes.

Id. at 229-31 (emphases added). Based on the changes in Friedman's demeanor, his response to

the impeachment evidence, his clear reluctance to testify against Wieder, his closer relationship

with defendant, and the way in which his initial insertion of the "hopefully" language closely

tracked a legal argument raised by Wieder during the course of litigation,[5] the court concludes

---

[5] See, e.g., Mem. of Law in Supp. of Def. Abraham Wieder's Mot. for Summ. J., Dkt. #199, at 2 ("[T]hat Wieder expressed hopes to Plaintiff that Konig might pay Plaintiff is not a ground to invoke equitable estoppel.") (emphasis

that Friedman testified truthfully only after being impeached by his sworn deposition testimony: Wieder did not merely express "hopes" that plaintiff would be paid if Roth confirmed the validity of the loan; rather, defendant represented that plaintiff would be paid if Roth verified the loan.

In sum, the court finds that the clear implication of Wieder's representations to Bild regarding the arbitration was that plaintiff would be paid at the conclusion of the process. It is apparent that plaintiff believed that the issue to be arbitrated was who would repay his loan—and not whether the loan would be repaid. In addition, the court finds that Wieder represented to Bild that the main barrier to repayment was the need to verify the loan, and that Konig would be bound by Roth's determination as to whether the loan really existed and whether Konig, rather than Wieder, had to repay Bild. The court concludes that Wieder made these representations to Bild to secure plaintiff's consent to arbitration and thereby avoid litigation.

## G.    The Arbitration

As defendant had promised, Weider and Konig entered into an agreement ("Arbitration Agreement") on November 3, 2004, to submit to "binding arbitration the various disagreements" between them. Pl.'s Ex. 14, at 1. Roth, who was appointed as arbitrator, confirmed in his deposition that the arbitration was intended to address "all outstanding issues" between Wieder and Konig. Pl.'s Ex. 18, at 20. Explaining the timing of the arbitration, Wieder testified that it was only around this time that he could "resume [his] life," id. at 378, because he was granted an

---

added); id. at 7 ("Plaintiff's entire equitable estoppel argument is based upon Plaintiff's claim that Wieder promised, or more correctly 'hoped', that Bild would be paid by Konig as a result of the Arbitration. This claim relates to a promise of future conduct and therefore does not suffice for equitable estoppel.") (emphasis added); id. at 8 ("Wieder, the purported obligor, never represented that he would be paying back the monies owed to Plaintiff. On the contrary, Wieder made it clear that while he wanted Plaintiff to be paid back, he had no means to pay the monies owed. Instead, Wieder repeatedly asked that Plaintiff hold off on commencing suit because he hoped that as a result of the Arbitration, Konig would pay Plaintiff.") (emphasis added); id. at 9 ("Bild's claim that he relied upon Wieder's 'hope' that Konig would pay Bild after the Arbitration in failing to timely file suit simply does not suffice for equitable estoppel.") (emphasis added).

early termination of probation in late November or early December 2004.

The arbitration commenced on January 31, 2005. Pl.'s Ex. 18, at 32-33. It was not until the initial meeting—after Konig had already signed the agreement committing him to arbitrate—that Wieder showed Roth and Konig a copy of the Loan Agreement for the very first time. Tr. 379-80; Pl.'s Ex. 12, at 139, 145; Pl.'s Ex. 18, at 70. As Wieder admitted at trial, he purposely did not disclose Bild's loan to Konig until that point: "I wanted [Konig] first signed to arbitration so I used, you know, I wanted to use every trick in the book to get him in there."[6] Tr. 380. Defendant claimed that Konig "would never come to the arbitration" had he known of Bild's loan beforehand. Id. at 379. As Wieder explained, he had a hunch that Konig would refuse to recognize Bild's loan given that the loan was funded through "cash, pieces of paper." Id. at 380.

Konig did indeed challenge the existence of the loan, and as discussed, Roth therefore traveled to Florida to inspect Bild's documents and confirm the validity of the loan. Id. at 90-91; Pl.'s Ex. 18, at 74. Although Roth made an initial visit to Miami in February 2005, he was unable to access Bild's safe deposit box during that trip because plaintiff's key did not fit. Tr. 92; Pl.'s Ex. 7. After plaintiff followed up with "many calls," Roth made another trip to Miami in December 2005. Tr. 93. During this second visit, Roth was able to access plaintiff's safe deposit box. Id. at 94; Pl.'s Ex. 7. After inspecting plaintiff's documents, Roth concluded that Bild had made a "real loan" to Wieder. Pl.'s Ex. 18, at 104.

Thereafter, Roth informed Weider and Konig that he believed the loan to be real because he had seen the copy of the Loan Agreement in the safe and was "able to substantially confirm the money." Id. Roth moreover communicated to Wieder and Konig his opinion that the loan

---

[6] Wieder's willingness to conceal material information from Konig to secure Konig's agreement to arbitrate lends further support to the court's earlier conclusion that Wieder misrepresented the arbitration to Bild to induce plaintiff to consent to having the loan repayment issue arbitrated rather than litigated.

was "an obligation of Mr. Konig." Id. at 62-63. As Wieder conceded at trial, he then informed plaintiff "many times" that Roth had confirmed the validity of the loan. Id. at 333. Wieder moreover testified that he (usually through Friedman) provided Bild with "constant" updates throughout the course of the arbitration. Id. at 329.

After Roth confirmed the validity of the loan, Wieder encouraged Konig to meet with Bild to "resolve" the issue. Id. at 388. Konig met with Bild in 2006, but "behaved terribly," "just playing around and not settling anything and telling [Bild] I going to pay you a million or two million. I am going to pay it out in 20, 25 years, these type of things." Id. According to Wieder, Bild "called [defendant] up very upset" after the meeting. Id.

In addition to his single conversation with Konig, however, Bild spoke with Roth "many times" in 2006 to ascertain when he would be repaid. Tr. 96. Plaintiff's testimony is confirmed by his phone records, which show twelve outgoing calls to Roth.[7] Pl.'s Ex. 21. It is also corroborated by Roth's general acknowledgement that he spoke to Bild "a bunch of times" throughout the arbitration. Pl.'s Ex. 18, at 155. In response to Bild's queries, Roth told plaintiff that "he's working on it and he's confident that the loan was made." Tr. 101. Roth also informed Bild that he had spoken to Friedman and Wieder, who provided Roth with a further basis to conclude that the loan was real. Id. at 103. Therefore, Roth explained, Bild would "get paid very soon." Id. Plaintiff testified that he believed Roth "100 percent," given his understanding that Roth headed a big company with many employees, served as the accountant for both Wieder and Konig, and possessed "the legal power to decide like a judge." Id. The court credits Bild's testimony regarding both the substance of Roth's representations and the effect that these representations had on plaintiff.

---

[7] Again, plaintiff's telephone records do not reflect any incoming calls. Id. at 100.

Despite Roth's representations, Bild's loan remained unpaid as 2006 drew to a close. Id. As a result, Bild advised Wieder and Roth that he was considering bringing a lawsuit. Id. at 103-04. In response, according to what Wieder told Friedman, defendant asked Roth to arrange a meeting with Bild, id. at 239, and the four men met at the Javits Center around January 2007, id. at 103-05, 231-34, 237-39; Pl.'s Ex. 18, at 149-50.[8] Roth allayed Bild's concerns during the meeting, informing plaintiff that "he was working on it" and that he just needed some time because "Konig was a very difficult man to get." Id. at 103-04. Bild testified that Roth assured him that "they had all the evidence" and that plaintiff would be repaid. Id. Friedman confirmed Bild's account, testifying that Roth said, "[A]t the end of day Mr. Konig will have to repay the loan through the arbitration." Id. at 237.

In addition, Bild and Friedman both provided credible testimony that plaintiff communicated his thoughts about hiring an attorney and that Roth dissuaded him from doing so. Id. at 103-04, 238-39. In short, Roth told plaintiff, "Let me handle it." Id. at 238. According to Friedman, Roth explained that "he did already this whole work, he went down [to Florida], he saw everything, he did everything . . . so let [him] handle it." Id. Roth moreover reassured Bild that he would "be the first person" to tell Bild if plaintiff needed a lawyer. Id. at 104. Plaintiff recalled, "He said if you get a lawyer I won't be able to help you, so let me do it my way. I believed him. He persuaded me." Id.

In contrast, Roth testified that he could not recall Bild asking whether plaintiff should hire an attorney. Pl's Ex. 18, at 150-51. However, Roth's testimony has little probative value, given his concededly poor recollection of this meeting. For example, Roth testified that he could not remember who was present at the meeting, id. at 149-50, and that he did not recall the

---

[8] As discussed below, Roth served as Wieder's agent for the purposes of the Javits Center meeting. See infra Subsection II.A.2.i.b. As a result, Roth's statements, as recounted by Bild and Friedman, are admissible as admissions by a party-opponent. See Fed. R. Evid. 801(d)(2)(D).

contents of the conversation, id. at 150. When questioned about his conversations with Bild generally, Roth nevertheless asserted, "I never gave Mr. Bild advice if he should or should not hire attorneys." Id. at 175. However, based on the arbitrator's demeanor, as well as the contrast between the insistence with which he denied advising Bild not to seek legal counsel and the vagueness with which he testified about the actual contents of his conversations with Bild, the court finds Roth's testimony on this subject to be not credible. Instead, the court is left with the distinct impression that Roth was attempting to shield himself from potential liability with respect to any advice that he provided to Bild.

The court therefore discounts Roth's statements and credits Bild's testimony that he decided not to bring a lawsuit as a result of the reassurances he received during the Javits Center meeting.

**H.    The March 2007 Agreement**

Approximately two months after the Javits Center meeting, Konig and Wider entered into an agreement, dated March 29, 2007, pursuant to the arbitration. Pl.'s Ex. 10. Among other things, the March 2007 Agreement stated that "Wieder and Konig both acknowledge the outstanding loan given by Rafael Bild on behalf of Vanderveer Estates Holding, LLC, for $3,000,000." Id. at 2. The agreement also provided that "Konig agrees to fully satisfy the $3,000,000 outstanding loan." Id. In exchange, the document sets forth, "Weider agrees to fully cooperate in any tax matters that arise as a result of the various tax filings in reference to Vanderveer and Michael Konig" and "Konig is entitled to all losses not attributable to Abraham Weider's capital contributions." Id.

With respect to the "tax matters" referenced in the March 2007 Agreement, Wieder and Konig disagreed over the ownership of tax losses associated with Vanderveer. Pl.'s Ex. 12, at

24

192-93. At trial, Wieder admitted that he had failed to file tax returns for Vanderveer, and that until he did so, Konig could not complete his tax return. Tr. 380, 390. Konig likewise explained in his deposition, "At the time, my tax return was incomplete. And as such, the IRS had frozen some of my accounts." Pl.'s Ex. 12, at 152. As the accountant for both Wieder and Konig, Roth refused to file Konig's tax return until his clients signed an agreement resolving ownership of the tax losses.[9] Id.; accord Tr. 391.

The copy of the March 2007 Agreement in the record bears only Konig's signature. Pl.'s Ex. 10, at 3. Konig claims to have understood that Roth would simply hold onto the copy of the March 2007 Agreement signed by Konig "until a final agreement signed by both parties in [Roth's] presence would conclude the matter." Pl.'s Ex. 12, at 153. However, Konig's claim is not credible. It is difficult to believe that Roth would have signed off on Konig's tax returns until he was satisfied that his clients had reached a final resolution regarding the tax losses. Indeed, it is telling that neither Wieder nor Konig informed Roth when they subsequently entered into a new agreement that purported to supersede the March 2007 Agreement. Tr. 343; Pl.'s Ex. 18, at 188-90. Despite asserting that the March 2007 Agreement "was a working tool, not a complete agreement," Pl.'s Ex. 12, at 151, Konig admitted that he was "absolutely" concerned that he "would be creating liability for that loan" by signing the document, id. at 175-76.

Although Wieder testified that he did not "think" that he signed the March 2007 Agreement, Tr. 336, it is similarly difficult to believe his testimony. Wieder's denial is inconsistent with his admission that he subsequently directed Friedman to tell Bild that defendant

---

[9] Konig testified that Roth "insisted that a document be signed off on just acknowledging the issues that were at hand." Pl.'s Ex. 12, at 152 (emphasis added). The court discredits Konig's testimony to the extent that it suggests that Roth would have been satisfied with an agreement merely "acknowledging" the tax dispute between his clients. The court finds that Roth must have insisted on an agreement that resolved which client owned the contested tax losses.

and Konig had entered into the March 2007 Agreement. Id. at 337. And, as discussed, it strains

credulity that Roth would have consented to file Konig's tax returns until he could definitively

represent to the IRS which of his clients owned the tax losses associated with Vanderveer.

Wieder's admission that he conveyed the tax losses to Konig pursuant to the March 2007

Agreement moreover undermines his claim that he did not sign that document. Id. Significantly,

Roth—who, unlike Wieder and Konig, had no motive to lie about this matter—testified that he

received signed copies of the March 2007 Agreement from both Wieder and Konig. Pl.'s Ex. 18,

at 131. The court credits Roth's testimony that Wieder did, in fact, sign the March 2007

Agreement. Defendant's insistence that he did not sign the March 2007 Agreement reflects

poorly on his credibility.

A day or two after Wieder and Konig signed the March 2007 Agreement, Friedman

called Bild on Wieder's behalf and informed him that Wieder and Konig had signed an

agreement obligating Konig to repay plaintiff's loan. Tr. at 105-06, 240. Wieder admitted that

he directed Friedman to convey this news to Bild. Id. at 337. In addition, Bild testified credibly

that he believed what he was told:

> Everything has happened the way they told me it was going to happen. The
> arbitrator came down. I met him. I talked to him. He came to the conclusion that
> the loan was made. He was Mr. Wieder's accountant. He was Mr. Konig's
> accountant. He was somebody I could depend on and rely on.

Id. at 106.

Shortly after the March 2007 Agreement was signed, however, Konig told Wieder that he

did not intend to live up to the agreement. Id. at 338. Notably, Wieder admitted at trial that he

never informed Bild of Konig's decision to renege on the agreement. Id. at 338; accord 106.

Notwithstanding his knowledge that Konig had refused to live up to the March 2007

Agreement, the court finds, Wieder continued to represent to Bild that plaintiff would be repaid

pursuant to that agreement. Id. at 107. Bild testified that he followed up with Wieder, Friedman, and Roth after learning about the March 2007 Agreement. Id. at 106-07. The responses that Bild received amounted to, "We're working on it." Id. at 107. Wieder told Bild that Konig was just "a hard man to get," but that Bild would get paid soon. Id. Friedman likewise reassured Bild, explaining that Roth had the legal power to get plaintiff paid and that Bild would indeed be paid soon. Id. Moreover, Friedman explained that the delay in repayment was simply due to the difficulty of pinning down Konig, who was busy, engaged in various travels, and had a habit of cancelling appointments. Id.

Referencing the terms of the March 2007 Agreement, Friedman, at Wieder's request, id. at 214, 376, moreover told Bild that Wieder had secured Konig's promise to repay Bild through tax credits "worth so many millions," id. at 108, and that defendant "had a cemetery in Israel worth tens of millions of dollars as collateral," id. at 107. As mentioned earlier, however, Konig explained in his deposition that while the tax losses amounted to approximately $5 to $10 million, "only a percentage of the loss is . . . attributable to one's return." Pl.'s Ex. 12, at 193-94. The court finds that Wieder inflated the value of the tax losses to make plaintiff believe that Konig would, in fact, comply with the March 2007 Agreement.

This finding is supported by Wieder's admission regarding the cemetery that purportedly served as collateral to guarantee repayment of Bild's loan. With respect to plaintiff's loan, the agreement stated, "This outstanding loan and interest to accrue, if loan is paid in installments, will be guaranteed by Konig's share in Chasdei Olam and affiliated entities." Pl.'s Ex. 10, at 2. Bild testified that Chasdei Olam was a cemetery in Israel that Wieder had once taken plaintiff to see and about which defendant spoke frequently. Tr. 190-92. At trial, however, Wieder admitted, "The collateral was, you know, a joke. It wasn't collateral. . . . How will we ever

27

collect or do something with that? I mean, it just—it is there for—it's nice on paper but it just didn't mean anything." Id. at 397.

In sum, the court finds that Wieder knew very shortly after signing the March 2007 Agreement (if not all along) that Konig would not, in fact, repay Bild pursuant to that agreement. In addition, the court finds that Wieder nonetheless repeatedly represented to Bild that plaintiff would be repaid pursuant to the March 2007 Agreement.

**I.     The May 2007 Agreement**

Within two months of signing the March 2007 Agreement, Wieder and Konig entered into another agreement, dated May 17, 2007 ("May 2007 Agreement"), that allegedly superseded the earlier document. Id. at 106, 338; Pl.'s Ex. 17. The May 2007 Agreement purported to "embod[y] the complete and final agreement and understanding between the parties hereto and supersede[] all prior agreements and understandings relating to the subject matter hereof." Id. at 1. It provided, in relevant part:

> Certain parties/vendors maintain that they have claims against Wieder in connection with Vanderveer including . . . Raphael Bild in connection with a $3,000,0000 [sic] loan to Vanderveer in December of 1998. Konig agrees to indemnify Wieder for any actual monetary damages, costs and expenses, including reasonable attorneys' fees, sustained by Wieder in connection with and arising from any such claims.

Id. Although the May 2007 Agreement referenced the signatories' previous agreement to "submit to binding arbitration with Abraham Roth" and their "wish to resolve the arbitration proceedings heard by Roth," id. at 1-2, neither Wieder nor Konig informed Roth of its existence, Pl.'s Ex. 18, at 188-90. Nor was Bild advised of the new agreement. Tr. 106.

At trial, Wieder admitted that he never told either Bild or Roth about the May 2007 Agreement. Id. at 342-43. Attempting to justify his failure to disclose the new agreement to plaintiff, Wieder vacillated between two contradictory explanations. On the one hand, Wieder

insisted that there was no need to tell Bild because the two agreements were equivalent with respect to their benefit to plaintiff, as Wieder testified, "Nothing changed and nothing was different in my eyes." Id. at 344; accord id. at 343. Yet, when pressed by plaintiff's counsel, Wieder advanced a different rationale, maintaining that Bild was not harmed by the lack of disclosure because the May 2007 Agreement was actually "stronger," id. at 344, and constituted "a much better deal," id. at 339, whereas the March 2007 Agreement was "meaningless," id. at 339, "just didn't take anything into consideration," id. at 343, and amounted to "nothing," id. at 344. In response, plaintiff's counsel inquired how the May 2007 Agreement, which provided only that Konig would indemnify Wieder for Bild's loan, could be more protective toward plaintiff than the March 2007 Agreement, which directly obligated Konig to repay Bild's loan. Id. at 345. Wieder then conceded that he believed the May 2007 Agreement was superior because it protected him. Id. Nevertheless, defendant hastened to add, "If it protects me, I had a way to go, in fact to get Bild paid, too." Id. at 343-45.

Despite Wieder's attempt to characterize the May 2007 Agreement as a boon to Bild, it was defendant who truly benefited from securing the new agreement, which provided him with full indemnification, id. at 343. The inconsistency between Wieder's different rationales for keeping Bild in the dark about the May 2007 Agreement is striking. The court finds Wieder's explanations to be completely incredible: it is clear that defendant entered into the May 2007 Agreement with his own best interests in mind, purposely concealing the new agreement from Bild to sustain plaintiff's belief that there remained a valid agreement obligating Konig to directly repay the loan.

J.      **Wieder's Continued Reassurances of Repayment Following the Arbitration**

Months went by after Bild learned of the March 2007 Agreement. During this time,

plaintiff continued to call Wieder and Friedman to follow up on the status of the repayment. Id. at 108-09. Both men responded by telling Bild not to worry because payment would be forthcoming from Konig and that they were just "working on the papers," which plaintiff understood to mean the documents needed to finalize the release of funds. Id. at 109. As plaintiff credibly testified, "I thought they were working on the paperwork maybe for the release of the cemetery in Israel or if he gives me a release or there's some legal paperwork they have to do to pay me." Id. Bild's explanation for how he understood Wieder's and Friedman's representations is corroborated by an email that he sent Friedman on September 11, 2008:

> [P]lease try to give a call to Mr. Weeder [sic] to see if he can call Mr. Roth and see if the papers are finished. It should not take this long to draw this type of paperwork. In any case what I need is a check from Michael [Konig], [n]ot a piece of paper to drag another bunch of years. Please see what you can do. I ready [sic] need this money.

Pl.'s Ex. 8. When questioned what he meant by the "paperwork" referenced in the email, Bild testified, "[Wieder] needs legal paperwork so that the release of the agreement or release of the collateral, I don't really know, but there's paperwork involved with any transaction." Tr. 111. The court credits Bild's explanation as to how he understood Wieder's and Friedman's representations and moreover finds that defendant intended Bild to have such an understanding.

By the beginning of 2009, Bild had yet to be repaid and again considered suing Wieder. Id. at 113. Accordingly, Bild wrote a letter to Roth in February 2009 inquiring into the status of the "dispute" between Weider and Konig and requesting a meeting with the arbitrator. Tr. 112-13; Pl.'s Ex. 9 ("I have been extremely patience [sic] and placed all my trust on you to resolve this issue for Mr. Weeder [sic] and me. I know you are a busy man, but please, if you could take at least one meeting to explain to me yourself what's going on with your own words, I would greatly appreciate it."). The court denies defendant's objection that Bild created the February

30

2009 letter "for the purpose of litigation," Dkt. #239, at 11.

Pursuant to Bild's request, plaintiff, Weider, Roth, and Friedman met at Roth's office later that month. Tr. 114, 241, 344. As Wieder confirmed at trial, the purpose of the meeting was "to try to assure Mr. Bild that [defendant] and Roth were doing everything [they] can to secure repayment by Mr. Konig." Id. at 344. During the meeting, Roth showed Bild a copy of the March 2007 Agreement, and read to Bild the paragraph of the agreement that required Konig to repay the loan and to post the Chasdei Olam cemetery as collateral to secure the repayment. Id. at 115-16, 242-43, 344. Although Wieder denied that he directed Roth to show Bild the agreement and claimed that Roth did so of his own accord, id. at 344, Roth testified in his deposition that he did so at Wieder's direction, Pl.'s Ex. 18, at 182-83. The court credits Roth's testimony, not in the least because of Wieder's demonstrated readiness to conceal the truth, as exemplified by his failure to inform Bild or Roth of the May 2007 Agreement.[10]

In addition, Wieder conceded that he neither informed Bild that Konig had refused to comply with the March 2007 Agreement nor told plaintiff that the agreement had been superseded by the May 2007 Agreement. Id. at 344, 346. On the contrary, after Bild had seen the March 2007 Agreement, Wieder, Roth, and Friedman all assured plaintiff that he had nothing to worry about because of the collateral set forth in that document and because Roth had similar powers to those possessed by a judge. Id. at 116, 245-46. Furthermore, Roth advised Bild that if plaintiff filed a lawsuit, then Roth would no longer be able to help him obtain repayment of the loan. Id. at 116. Although Bild asked for a copy of the March 2007 Agreement, Roth refused to

---

[10] In any event, Wieder admitted that he did not object to Roth showing Bild the March 2007 Agreement, which is tantamount to a ratification of its contents. See Orix Credit Alliance v. Phillips-Mahnen, Inc., No. 89 Civ. 8376 (THK), 1993 WL 183766, at *5 (S.D.N.Y. May 26, 1993) ("One may be deemed to have ratified the acts of an agent through silence when there is an opportunity to speak and, under the circumstances, a desire to repudiate would normally be expressed.") (citing New York cases).

provide it to him. Id. at 116, 245, 346; Pl.'s Ex. 18, at 182.

The court finds that the clear implication of what Bild was shown and told at the February 2009 meeting was that the March 2007 Agreement remained valid, that Roth had the power to enforce it, and that plaintiff would lose the guarantee of being paid pursuant to the March 2007 Agreement if he brought a lawsuit.

**K.      Bild's Commencement of the Lawsuit**

Following the February 2009 meeting, Roth began evading Bild's calls. Tr. 117. Around May 2009, Bild managed to get through to the arbitrator. Id. at 118. During that conversation, Roth finally told Bild, "[T]here's nothing else I can do for you." Id. In response, Bild wrote to Roth a letter dated May 19, 2009, pleading one final time for the arbitrator's assistance. Id. at 120-21; Pl.'s Ex. 11. Plaintiff asked for a copy of the March 2007 Agreement and reminded the arbitrator, "I was assured by you that you would do everything in your power to make sure that I would get my money back. And I know you are the only one at this point that can make this happen as you have all the tools for it." Id. Plaintiff also entreated, "I always thought this would be taken care by you in a nice way as you have told me in the last 4 or 5 years with no need to get lawyers involved." Id. Roth never responded to Bild's letter. Id. at 122. The court overrules defendant's objection that Bild created the May 19, 2009 letter "for the purpose of litigation," Dkt. #239, at 11; on the contrary, there is every indication that plaintiff wrote the letter with the objective of avoiding litigation.[11]

Not long thereafter, in the middle of 2009, Bild advised Friedman that he was going to

---

[11] In the May 19, 2009 letter, Bild also wrote, "I have consulted with one of my lawyers Mr. Robert Ringberg [sic] and in his opinion your recommendation to sue Mr. [Wieder] is not a very good option at this point." Pl.'s Ex. 11, at 11. At trial, Bild clarified that Rimberg was actually Wieder's attorney. Tr. 182. In addition, Bild credibly explained that he had asked Wieder to ask Rimberg for advice on how to proceed because, at the time, he perceived Wieder to be "on [his] side." Id. Furthermore, both plaintiff and Roth acknowledged that Roth's "advice" that Bild sue Wieder was clearly not a genuine suggestion, but was rather a comment that the arbitrator made out of frustration. Id. at 185; Pl.'s Ex. 18, at 175.

pursue a lawsuit. Tr. 122. At the same time, plaintiff testified that he was still trying to "reverse this and talk to Wieder and Pincus to see if it was really possible that this could happen." Id. After having no success, plaintiff called Friedman a few months later and told him that he was "going to sue them if [he didn't] get paid very soon." Id. In response, Friedman spoke with Wieder and informed Bild a couple of days later, "I think [Wieder] said it's too late now, the statute of limitation just ran out." Id. at 122-23. Plaintiff testified credibly that he "just couldn't believe it," explaining that he never thought that the statute of limitations would be running during the ongoing arbitration, which he understood to be a legal proceeding. Id. at 123.

Thereafter, in August or September 2009, Bild contacted his attorney, Dan Bandklayder, to discuss the loan. Id. Although plaintiff's phone records show that he had been in contact with Bandklayder prior to the fall of 2009, Def.'s Ex. A, plaintiff explained that he and Bandklayder were former college roommates and friends who communicated with each other socially and, very occasionally, about problems that Bild had with his jewelry business.[12] Id. at 135, 139-41. The court credits plaintiff's testimony that he first spoke with Bandklayder to seek legal assistance regarding repayment of the loan only in the fall of 2009. See id. at 123-24. As Bild explained, he had not consulted an attorney earlier because he "didn't see a need for it," insofar as he "had an arbitrator, just the same as a Federal Judge." Id. at 124. Particularly in light of Bild's understanding that he would be repaid pursuant to the March 2007 Agreement—the validity and enforceability of which Wieder, Roth, and Friedman had all impressed upon plaintiff as recently as February 2009—the court finds Bild's explanation to be entirely plausible.[13]

---

[12] The court notes that Magistrate Pohorelsky had previously ordered Bandklayder, for the purpose of determining when "he first discussed [with plaintiff the] matter of Wieder," to submit for in camera inspection any billing records relating to Bild's loan. Dkt. #158, at 65. After reviewing the submissions, Magistrate Pohorelsky ordered the production of only one invoice, which was dated November 9, 2009. Dkt. #168.

[13] In an effort to discredit Bild's testimony that he turned to the legal system as a last resort, defense counsel asked plaintiff whether, in dealing with his jewelry business, he ever consulted with attorneys to seek repayment from

In his deposition, Roth testified, "Mr. Bild mentioned to me numerous times that he's consulted attorneys and he had other ways of taking care of this, that's what I remember, but I never told Mr. Bild he should hire, he shouldn't hire an attorney." Pl.'s Ex. 18, at 175. However, insofar as Roth does not specify the time period in which Bild allegedly made these representations, his testimony has little probative value as to establishing when Bild first spoke to an attorney. Notably, the only example that Roth provides relates to Bild's May 19, 2009 letter, in which plaintiff mentioned receiving advice from Rimberg. Id.; Pl.'s Ex. 11. As Bild clarified at trial, however, he had never actually spoken to Rimberg; instead, after plaintiff approached Wieder for advice on how to get repaid by Konig, Wieder consulted with Rimberg and communicated to Bild what defendant represented to be Rimberg's thoughts. Id. at 182.

The court is left with the impression that Roth may have, over time, come to remember Bild's repeated threats to sue as statements that plaintiff had consulted with an attorney. Although it is evident that Roth had the impression that Bild had spoken to an attorney, see, e.g., id. at 176 ("When I got [the May 19, 2009] letter I felt like a lawyer dictated this to him.") (emphasis added), it appears that the arbitrator may have arrived at this conclusion based on Bild's mention of Wieder's attorney and on plaintiff's repeated threats to litigate. Roth's deposition testimony is thus insufficient to rebut Bild's account as to when plaintiff first consulted with an attorney with respect to the loan and repayment.

About three months after contacting Bandklayder, Bild commenced this lawsuit on December 21, 2009. Dkt. #1; Tr. 124.

---

customers who were delinquent in their payments. In response, Bild credibly testified that he had done so only two or three times over thirty-two years—and that he did so only "[w]hen the people have an attitude, say I will not pay you." Id. at 168. Under normal circumstances, Bild explained, he would simply "try to work it out." Id.

## II. CONCLUSIONS OF LAW

Wieder does not dispute that Bild has established the basic elements of plaintiff's claims for breach of the Loan Agreement and breach of the Promissory Note. Dkt. #244, at 2-5. Instead, the only issue tried before this court was Wieder's affirmative defense that Bild's action is barred by the six-year statute of limitations for contract actions under New York law. Dkt. #244, at 3; see N.Y. C.P.L.R. § 213(2). With respect to this issue, Bild argues that Wieder should be equitably estopped from asserting the statute of limitations defense. Specifically, plaintiff maintains that Wieder lulled him into withholding suit through extended misrepresentations that plaintiff would be repaid without litigation. In opposition, defendant contends that (1) Bild has not satisfied the elements of equitable estoppel, which would otherwise extend the statute of limitations period; and, (2) even if he has, plaintiff is not entitled to equitable relief because of his "own unclean hands regarding the loan at issue." Dkt. #244, at 3; Dkt. #276; Dkt. # 280, at 13-19.

### A.    The Applicable Statute of Limitations

As an initial matter, the parties disagree as to when the statute of limitations on the Loan Documents accrued. Defendant argues that the statute of limitations began running on December 31, 1999—the date of execution—and expired six years later on December 31, 2004. Dkt. # 277. In contrast, Plaintiff maintains that the statute of limitations began running on December 31, 1999—the date of breach—and thus did not expire until December 31, 2005. Dkt. #281, at 19-22. As discussed below, Bild has proven the elements of equitable estoppel even assuming that the statute of limitations expired on the earlier date. The court therefore assumes, without deciding, that the statute of limitations ran on December 31, 2004.

35

**B.     Equitable Estoppel**

The parties next disagree as to whether plaintiff is entitled to invoke equitable estoppel so as to preclude Wieder from asserting the statute of limitations defense.

**1.     Legal standard**

Under New York law, equitable estoppel will "preclude a defendant from using the statute of limitations as a defense 'where it is the defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.'" Putter v. N. Shore Univ. Hosp., 858 N.E.2d 1140, 1142 (N.Y. 2006) (alteration in original) (quoting Zumpano v. Quinn, 849 N.E.2d 926, 929 (N.Y. 2006)); see Robinson v. City of N.Y., 265 N.Y.S.2d 566, 569-70 (App. Div. 1965) ("[W]here the agreement, representations or conduct of a defendant have caused a plaintiff to delay suit on a known cause of action until the statute of limitations has run, the courts will apply the doctrine of estoppel to prevent an inequitable use by the defendant of the statute as a defense."). Equitable estoppel is an "extraordinary remedy," E. Midtown Plaza Hous. Co., Inc. v. City of N.Y., 631 N.Y.S.2d 38, 38 (App. Div. 1995), that "must be established by 'clear and convincing proof.'" Dombroski v. Samaritan Hosp., 846 N.Y.S.2d 430, 433 (App. Div. 2007) (quoting Cent. Fed. Sav. F.S.B. v. Laurels Sullivan Cnty. Estates Corp., 537 N.Y.S.2d 642, 645 (App. Div. 1989)). To successfully invoke the doctrine of equitable estoppel, a plaintiff must make "a showing of fraud, misrepresentation, deception, or similar affirmative misconduct, along with reasonable reliance upon it." DeGori v. Long Island R.R., 610 N.Y.S.2d 815, 816 (App. Div. 1994).

The parties dispute whether the intent to deceive or mislead is an element of equitable estoppel under New York law. See Dkt. #280, at 13-15; Dkt. #281, at 22-24. The New York Court of Appeals has strongly suggested that it is not, stating in dicta that "'[a] party may not,

even innocently, mislead an opponent and then claim the benefit of his deception.'" <u>Triple Cities</u>

<u>Constr. Co. v. Md. Cas. Co.</u> ("<u>Triple Cities</u>"), 151 N.E.2d 856, 858 (N.Y. 1958) (quoting

<u>Romano v. Metro. Life Ins. Co.</u>, 2 N.E.2d 661, 663 (N.Y. 1936)).

     In addition, there are cases in which the Appellate Division of the New York Supreme

Court has explicitly held that the circumstances justifying estoppel "may arise without the

existence of fraud or an intent to deceive." <u>Rodriguez v. Morales</u>, 607 N.Y.S.2d 1, 2 (App. Div.

1994). As the Appellate Division has articulated, "If the representations or conduct of the

defendants misled the plaintiffs, even innocently, this is enough . . . 'and it is immaterial that

defendant intended no wrong.'" <u>Dupuis v. Van Natten</u>, 402 N.Y.S.2d 242, 243 (App. Div. 1978)

(quoting <u>Robinson</u>, 265 N.Y.S.2d at 570). At the same time, the Appellate Division has

indicated in other cases that the intent to mislead <u>is</u> an element of equitable estoppel. For

example, it has explained:

> Equitable estoppel requires clear and convincing proof that the party against
> whom estoppel is directed misrepresented or concealed material facts, with
> knowledge of the real facts, and with the intention that the other party act in
> reliance upon the disingenuous conduct and that the party seeking to invoke
> estoppel detrimentally relied on that conduct in excusable ignorance of the true
> facts.

<u>Cent. Fed. Sav. F.S.B.</u>, 537 N.Y.S.2d at 645.

     Because there is clear and convincing evidence in the record that Wieder <u>did</u>, in fact,

intend to deceive or mislead Bild into believing that plaintiff would be repaid without resort to

litigation, the court does not need to resolve the issue of intent. Instead, the court will simply

discuss why the record supports a conclusion that Wieder intended to lull plaintiff into inactivity

through false and misleading representations.

     Finally, even if a plaintiff has reasonably relied on the defendant's affirmative

misconduct, he must still bring suit "within a reasonable time after the facts giving rise to the

estoppel have ceased to be operational." <u>Simcuski v. Saeli</u>, 377 N.E.2d 713, 717 (N.Y. 1978);

<u>see</u> <u>Overall v. Estate of L.H.P. Klotz</u>, 52 F.3d 398, 404 (2d Cir. 1995) ("Because a person who

seeks equity must do equity, a plaintiff invoking estoppel must show that he brought his action

'within a reasonable time after the facts giving rise to the estoppel have ceased to be

operational.'") (quoting <u>Simcuski</u>, 377 N.E.2d at 717).  As the Appellate Division has further

explained:

> Where an estoppel to assert the statute of limitations is made out, . . . <u>Simcuski</u>
> makes clear that the question most critical to a statute of limitations defense—
> when did the limitations period expire—loses its determinative significance, and
> another must be addressed as well—was the action commenced within a
> reasonable time after the facts giving rise to the estoppel ceased to be operational.
> This requires the court to determine first, as a matter of fact, when the deception
> ceased to be operational, and second, as a matter of law, what constitutes a
> reasonable period of time in which to have commenced an action . . . .  If the
> reasonable period of time expires before the statutory period, the plaintiff does not
> stand to gain any time from the estoppel; but if the reasonable period of time
> extends beyond the statutory period, then the action is timely if commenced
> within the reasonable period, and it should make no difference whether the facts
> giving rise to the estoppel ceased to be operational before the expiration of the
> statutory period . . . .

<u>Harkin v. Culleton</u>, 554 N.Y.S.2d 478, 480 (App. Div. 1990).  In addition, the Second Circuit has

instructed that "[e]quitable estoppel . . . looks at the parties' conduct . . . to determine their

relative blameworthiness in delaying the commencement of suit."  <u>Overall</u>, 52 F.3d at 404.

### 2.  Analysis

#### i.  Wieder's misrepresentations

Bild has proven by clear and convincing evidence that Wieder intentionally misled him

with representations that plaintiff would be repaid without resort to litigation.  The record shows

that Wieder engaged in an extended course of "affirmative misconduct," <u>DeGori</u>, 610 N.Y.S.2d

at 816, that began prior to December 31, 2004 and extended into 2009.

#### a.  Before December 31, 2004

Wieder testified that "[e]verything fell apart" and that he "[l]ost everything" between April 2001 and November 2004. Tr. 378. Accordingly, defendant must have known before December 31, 2004—the date on which he claims that Bild's statute of limitations expired—that he lacked the means to personally repay Bild. If Wieder did not have the money to pay Bild, then the only way in which plaintiff would have been repaid would have been through another person. Here, that other person would have been Konig.

However, Wieder did not secure Konig's agreement to repay Bild prior to December 31, 2004. In fact, Wieder did not even disclose Bild's loan to Konig before that date. Instead, Wieder entered into agreements with Konig in March 2001, pursuant to which Konig generally agreed to indemnify Weider against "any and all loss and expenses . . . that may be suffered by [Wieder] as a result of or in connection with his previous ownership interested in [Vanderveer]." Pl.'s Ex. 15; Pl.'s Ex. 16.

Nonetheless, as early as 2002, and certainly in 2003, Wieder (both directly and through Friedman) repeatedly reassured Bild that he would be repaid pursuant to the March 2001 Agreements. In doing so, Wieder falsely represented that he had secured an agreement obligating Konig to directly repay Bild if defendant were unable to do so himself.

After Bild threatened to bring suit in early 2004, Wieder dissuaded Bild from doing so, reiterating the lie that Konig had already signed a contract that required him to repay Bild. To make Bild believe that Konig would, in fact, follow through on this purported agreement, Wieder claimed to have given Konig "so many millions" in tax write-off credits "that the payment to [Bild] would have been nothing compared to that." Tr. 84. In essence, Wieder purposely created the impression that Konig stood to gain substantially from the March 2001 Agreements; by doing so, defendant attempted (successfully) to make Bild believe that Konig had every incentive to

39

follow through on his purported obligation to repay plaintiff directly. Defendant knew all along, however, that Konig had never agreed to repay Bild's loan, did not even know about plaintiff's loan, and would "fight it like an animal," id. at 332, when he finally did learn about it.

Thereafter, Wieder urged Bild to allow the loan repayment issue be resolved through arbitration rather than litigation. To secure Bild's forbearance, defendant communicated to plaintiff (either directly or through Friedman) that he would be repaid once an arbitrator made a factual determination that plaintiff had indeed loaned Wieder the money. More specifically, Wieder gave Bild the impression that Konig simply needed proof that the loan was real before repaying it, and that Konig would have to abide by an arbitrator's finding regarding the validity of the loan. Defendant thus fostered Bild's belief that Roth would issue a binding order requiring Konig to repay Bild once the arbitrator confirmed the loan, and that arbitration was in fact the only way to ensure Bild's repayment. Despite his representations to Bild, Wieder was well aware of the following: although Roth's verification of the loan was necessary before Konig would even consider agreeing to repay Bild's loan, it was certainly not sufficient to guarantee such a result.

Based on the foregoing, Bild has proven by clear and convincing evidence that Wieder intentionally lulled Bild into withholding suit through repeated misrepresentations prior to December 31, 2004.

### b.    After December 31, 2004

After the arbitration commenced in January 2005, Wieder continued to mislead Bild with representations that plaintiff would be repaid by Konig through the arbitration process. Although Roth traveled to Florida and confirmed the validity of Bild's loan in December 2005, plaintiff remained unpaid as 2006 went by. As 2006 drew to a close, Bild thus advised Wieder that he

was thinking of bringing a lawsuit. Thereupon, Wieder instructed Roth to arrange a meeting with plaintiff, the purpose of which was to reassure Bild that he would be paid. Complying with Wieder's request, Roth met with Bild, Friedman, and Wieder at the Javits Center around January 2007.

There is clear and persuasive evidence in the record supporting an inference that Roth acted on Wieder's behalf during this meeting. "New York common law provides that an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'" N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 122 (2d Cir. 2001) (quoting Meese v. Miller, 436 N.Y.S.2d 496, 499 (App. Div. 1981)). According to Friedman, Wieder admitted that he directed Roth to orchestrate the Javits Center meeting after plaintiff had threatened to sue. It can fairly be inferred that Roth approached the meeting with the understanding, shared by Wieder, that the arbitrator would be addressing defendant's concerns about Bild's threat to litigate. The court therefore concludes that the arbitrator qualifies as defendant's agent for the purposes of this meeting.

Acting in this capacity, Roth dissuaded Bild from suing. Specifically, Roth reassured Bild that Konig would have to repay the loan at the conclusion of the arbitration. Roth also told Bild to let the arbitrator handle the issue and informed plaintiff that he would be the first person to let Bild know if he needed to hire an attorney. Through Roth, Wieder thus gave Bild a false sense of security that he would be repaid by Konig pursuant to the arbitration—even though defendant knew that Konig had not, in fact, agreed to repay Bild's loan.

Subsequently, Wieder and Konig signed the March 2007 Agreement, which did provide that Konig would repay Bild's loan. However, Wieder's admission that the collateral securing

Konig's promise was "a joke," Tr. 397, creates a strong inference that Wieder knew from the start that the agreement was, in his own words, "meaningless," id. at 339. At the very least, Wieder certainly realized that Konig would not live up to the agreement when Konig informed him of that fact "shortly" after the document had been signed. Id. at 338.

Nonetheless, Wieder continued to falsely represent to Bild that Konig would repay him pursuant to the March 2007 Agreement. Through Friedman, Wieder communicated to Bild that defendant had secured Konig's promise to repay plaintiff through tax credits "worth so many millions" and that defendant "had a cemetery in Israel worth tens of millions of dollars as collateral." Id. at 107-08. All the while, Wieder was well aware that he was exaggerating the value of the tax losses, that the provision regarding the collateral was "nice on paper but . . . just didn't mean anything," id. at 397, and, above all, that Konig had already repudiated the March 2007 Agreement. In addition, Wieder directed Friedman to explain to Bild that the delay in repayment was simply attributable to the difficulty of pinning down Konig, who was busy, engaged in travels, and had a habit of cancelling appointments. Id. at 107. The clearly misleading nature of these representations evidences Wieder's intent to allay Bild's concerns and thereby stave off a lawsuit.

Thereafter, Wieder failed to inform Bild that defendant and Konig had entered into the May 2007 Agreement. The new agreement purported to supersede the March 2007 Agreement, and with respect to Bild's loan, provided only that Konig would offer Wieder indemnity. Wieder's concealment of the May 2007 Agreement from Bild evidences defendant's bad faith intent to perpetuate plaintiff's reliance on the March 2007 Agreement. Wieder's knowing misconduct is moreover evidenced by his representations to plaintiff, during late 2007 and 2008, that payment would be forthcoming once the "paperwork" to release the funds was completed.

42

Id. at 109. That Wieder likewise concealed the May 2007 Agreement from Roth (although the agreement explicitly referenced the signatories' prior consent "submit to binding arbitration with Abraham Roth" and their "wish to resolve the arbitration proceedings heard by Roth," Pl.'s Ex. 17, at 1-2) generates a substantial inference that defendant also intended to keep Roth under the impression that the March 2007 Agreement was still valid—as a result of which Roth would, in turn, continue to reassure Bild that Konig was required to repay plaintiff under the earlier agreement.

Wieder engaged in another clear act of affirmative misconduct toward Bild in 2009, when he directed Roth to show a copy of the March 2007 Agreement to plaintiff during the February meeting in Roth's office. Once more, Wieder was fully aware that the March 2007 Agreement had already been superseded by the May 2007 Agreement. Bild had expressed his intent to sue Wieder, and there is no other way to interpret Wieder's instruction to Roth than to conclude that defendant intended to make plaintiff believe that the March 2007 Agreement was still valid and binding—and thereby convince plaintiff to continue relying on the arbitration process instead of filing a lawsuit.

In sum, the record contains clear and convincing evidence that Wieder engaged in "a course of conduct designed to lead the plaintiff to believe that it was not necessary for [him] to do anything," Triple Cities, 151 N.E.2d at 859, to get repaid, and that this pattern of behavior took place both before and after December 31, 2004. In addition, the evidence amply supports a determination that Wieder did so with the intent to induce Bild to refrain from bringing suit. This case stands in stark contrast to those cases involving only a single instance of alleged misrepresentation. See, e.g., Donahue-Halverson, Inc. v. Wissing Constr. & Bldg. Servs. Corp., 464 N.Y.S.2d 268, 269 (App. Div. 1983) (rejecting estoppel argument based on a "single

43

instance . . . of a vague assurance that defendant would review the two accounts and any offsetting credits and would then pay plaintiff for the amount properly owed"); Crawford v. Cantor, 440 N.Y.S.2d 661, 663 (App. Div. 1981) (holding that the plaintiff failed to adduce sufficient facts to estop the defendant from pleading the statute of limitations where the plaintiff made "one allegation . . . in the entire record" of a misrepresentation and request for forbearance by the defendant). The record here is replete with evidence that Wieder made extensive and evolving misrepresentations to lull plaintiff into postponing suit over the course of nearly a decade.

### ii. Bild's reasonable reliance

To the extent that Bild relied on defendant's representations in delaying suit, Wieder argues, plaintiff acted unreasonably. In addition, Wieder challenges not only the reasonableness of Bild's reliance, but also the fact of plaintiff's reliance. Specifically, Wieder contends that Bild's decision to withhold suit until 2009 was not, in fact, attributable to defendant's representations. Rather, Wieder insists, plaintiff's true motivation for delaying suit was "to insulate himself from criminal prosecution for tax evasion, money laundering and perjury" by waiting for the applicable criminal statutes of limitations to expire. Dkt. #279, at 2.

### a. Plaintiff's reliance on Wieder's misrepresentations

The evidence adduced at trial offers clear and convincing support for the conclusion that, in delaying litigation, Bild reasonably relied on Wieder's extensive misrepresentations up through mid-2009.

During the first two years after Wieder's default, plaintiff testified, he relied on Wieder's and Friedman's reassurances that Wieder was temporarily occupied with legal issues, but that defendant owned a lot of property, was working on a transaction that would allow him to repay

44

Bild, and would in fact make the repayment. Bild's reliance on these representations was reasonable. Plaintiff testified credibly that he trusted Wieder and believed defendant to be an honest, successful, and well-respected businessman. Friedman, who was a close friend to both parties, had strongly vouched for Wieder's character and background. In addition, Wieder had told Bild of the various projects in which he was involved (including a recent successful transaction that had garnered nearly $30 million) and the properties that he owned—representations that understandably supported plaintiff's belief that Wieder had the financial capacity to repay Bild's loan. Bild's high degree of confidence in Wieder is substantiated by his willingness to loan defendant $3 million without requesting a prior inspection of Vanderveer's financial statements. Given his understanding of Wieder's character, reputation, and success, it was reasonable for Bild to trust defendant's reassurances of repayment. Cf. Guyot v. Al Charyn, Inc., 417 N.Y.S.2d 941, 946-47 (App. Div. 1979) ("[S]ince an employer has the right to place reliance upon the supposed qualifications and good character of the contractor, and is not bound to anticipate misconduct on his part, the employer is not liable on the ground of his having employed an incompetent or otherwise unsuitable contractor unless it also appears that he either knew, or in the exercise of reasonable care might have ascertained, that the contractor was not properly qualified to undertake the work.") (internal quotation marks omitted).

Subsequently, from 2002 or 2003 through 2004, Bild relied on Wieder's statements that defendant had signed an agreement with Konig obligating Konig to repay Bild's loan. Based on what he knew of Wieder's character and standing within the community, Bild had no reason to suspect that Wieder would mischaracterize the March 2001 Agreements. It was thus reasonable for plaintiff to withhold suit in the expectation that he would, in accordance with defendant's statements, be repaid pursuant to those agreements.

Bild also testified credibly that he relied on Wieder's representations in 2004 that defendant and Konig were going to enter into arbitration, pursuant to which plaintiff would ultimately be repaid. As part of that process, plaintiff understood, Roth would issue a binding decision requiring repayment of the loan once the arbitrator was able to confirm that Bild had indeed loaned Wieder the money. Insofar as plaintiff had in his possession all the documents evidencing the loan, it was reasonable for him to believe that Roth would verify the loan, after which payment would be forthcoming. The reasonableness of plaintiff's belief is bolstered by his understanding that Roth was an experienced and impartial arbitrator who headed a large, successful practice and who was well-respected within the community. It is also supported by the fact that Roth did, in fact, thereafter substantially confirm the loan.

This case bears a strong resemblance to Triple Cities Construction Co. v. Maryland Casualty Co., in which the New York Court of Appeals held that there was "ample basis" for a jury to find that the defendant was estopped from asserting a statute of limitations defense where "the record demonstrates that [plaintiffs] were misled into inactivity" insofar as they were "advised by opposing counsel that the settlement awaited only the determination of amount and that prompt payment would be made." 151 N.E.2d at 859. Here, similarly, Wieder represented that a single, insignificant obstacle stood in the way of repayment. Specifically, defendant claimed that the terms of the March 2001 Agreements already obligated Konig to repay Bild, and that Roth simply needed to confirm that the loan was real before requiring Konig to perform his purported promise under those agreements. That Wieder and Konig did, as defendant promised, enter into an Arbitration Agreement in November 2004 further supports the reasonableness of Bild's reliance on Wieder's representations. In accordance with Triple Cities, the court concludes that Bild reasonably relied on Wieder's representations regarding the arbitration in

deciding to postpone suit until after December 31, 2004.

In addition, the record contains clear and convincing evidence that Bild subsequently relied on constant updates from Wieder, usually through Friedman, that the arbitration was progressing as discussed. As an initial step, Roth traveled to Florida twice in 2005 to confirm the validity of Bild's loan. Thereafter, Roth, Wieder, and Friedman informed Bild that the arbitrator had concluded that the loan was real. Insofar as Bild had every indication that the arbitration was progressing as Wieder had promised it would, it was reasonable for plaintiff to continue relying on defendant's reassurances that he would be repaid at the conclusion of the process. That Konig attempted to settle the loan repayment issue for less than $3 million in 2006 does little to diminish the reasonableness of Bild's reliance on repeated reassurances from Wieder, Friedman, and, most importantly, Roth—whom plaintiff understood to be a neutral arbiter who possessed powers akin to those of a judge—that the arbitrator would ultimately order Konig to repay plaintiff.

Indeed, Bild subsequently learned from Wieder, Friedman, and Roth that defendant and Konig had entered into the March 2007 Agreement, which required Konig to directly repay Bild's loan. That Wieder and Konig did, in fact, sign such an agreement underscores the reasonableness of Bild's reliance upon defendant's representations. When Konig refused to live up to the March 2007 Agreement shortly thereafter, Wieder concealed Konig's repudiation from Bild. Wieder moreover hid from both plaintiff and Roth the fact that he and Konig superseded the March 2007 Agreement with the May 2007 Agreement. Without these critical pieces of information, it was reasonable for Bild to continue relying on the repeated assurances by Wieder, Friedman, and Roth that the March 2007 Agreement remained valid and that Roth had the power to enforce it. Given confirmation from the arbitrator himself that such an agreement had been

47

reached, it was reasonable for Bild to believe that he would be paid at the conclusion of the arbitration—notwithstanding the continued delay, which Wieder attributed to Konig's busy and unpredictable schedule and the need to draw up paperwork for the release of funds.

It is moreover significant that Roth, at Wieder's direction, showed Bild a copy of the March 2007 Agreement during the February 2009 meeting and reassured plaintiff that he would be repaid pursuant to that document. Again, Bild had every reason to rely on Roth, whom he perceived to be a neutral, judge-like figure who was empowered to conclusively decide the dispute between Wieder and Konig. In addition, if even the arbitrator still believed that the March 2007 Agreement was still valid at that point, then it was all the more reasonable for Bild to have thought the same. It was not until May 2009 that Roth finally told Bild, "[T]here's nothing else I can do for you." Tr. 118. Up until this point, the court concludes, there is clear and convincing evidence that Bild reasonably relied on Wieder's misrepresentations in deciding to postpone suit.[14]

### b.     Tax issues

Despite abundant and persuasive evidence that plaintiff's delay in suing was due to Wieder's extensive misrepresentations, defendant insists that "Bild's decision not to proceed against Wieder before the expiration of the civil statute of limitations, on December 31, 2004, sounded firmly and predominantly in Bild's obvious concern about criminal prosecution." Dkt. #279, at 2. Specifically, Wieder draws the court's attention to Bild's admissions that he failed to report to the IRS in 1998 or 1999: (1) the income that plaintiff used to fund the $3 million loan; and (2) the two foreign corporations that Bild owned and used to fund $1.4 million of the loan.

Defendant argues that plaintiff's failure to disclose the above information subjected him

---

[14] Wieder argues that "reasonable reliance required that a plaintiff exercise due diligence in investigating the facts." Dkt. #280, at 18. Based on the foregoing, however, the court concludes that Bild exercised all the diligence that was due under the totality of the circumstances. See Simcuski, 377 N.E.2d at 717.

to potential criminal prosecution for: (1) willfully filing a false return under penalty of perjury, pursuant to 26 U.S.C. § 7206; (2) tax evasion, pursuant to 26 U.S.C. § 7201; and (3) money laundering, pursuant to 18 U.S.C. § 1956. Id. at 5-7. Wieder maintains, "Only once the statutes of limitations for the crimes he had committed—crimes which relate directly to the funds loaned to Mr. Wieder—had safely passed, did Mr. Bild file suit for the return of the funds." Id. at 7.

As discussed, however, the court credits Bild's testimony that he was repeatedly dissuaded from bringing suit as a direct result of Wieder's continuous misrepresentations. Furthermore, Wieder's argument is completely unconvincing. First, as defendant admits, "[t]he statute of limitations for money laundering is 5 years." Id. at 6. Assuming, as Wieder does, that the statute of limitations for prosecuting Bild for money laundering began to run on December 29, 1998, the date Bild transferred funds from Hampton to CCL's account at the Mizrahi Bank, then the limitations period would have expired on December 29, 2003. Id. at 6-7. Accordingly, Bild still had an entire year, until December 31, 2004, to timely file suit after the criminal statute of limitations for money laundering expired. Second, defendant asserts that because there is a six-year statute of limitations for both tax evasion and filing a false return under penalty of perjury, Bild would not have been "safe" to file this action until the statutes of limitations for prosecuting those two crimes expired in July of 2006. However, Wieder's theory fails to explain why—if Bild's true reason for delaying suit was to avoid criminal prosecution—Bild would wait an additional three years after the criminal statutes of limitations had expired before suing.

Given the significant gap in time between the expiration of the criminal statutes of limitations and plaintiff's commencement of this lawsuit, the evidence of Bild's tax improprieties has minimal probative value with respect to establishing plaintiff's reason for delaying suit. Wieder's argument thus fails to undercut the court's conclusion that Bild

49

reasonably relied on defendant's misrepresentations in withholding suit until late 2009.

### iii.  Bild's diligence in bringing suit

Having determined that Bild postponed suit because of reasonable reliance on Wieder's misrepresentations—and not because he feared prosecution for tax-related improprieties—the court next examines whether plaintiff brought suit "within a reasonable time after the facts giving rise to the estoppel . . . ceased to be operational.'" Simcuski, 377 N.E.2d at 717. With respect to the reasonableness inquiry, the New York Court of Appeals has instructed that a plaintiff's diligence must be assessed in light of the totality of circumstances. Id. And the Second Circuit has further explained that courts should "determine the [parties'] relative blameworthiness in delaying the commencement of suit." Overall, 52 F.3d at 404.

Here, "the facts giving rise to the estoppel . . . ceased to be operational,'" Simcuski, 377 N.E.2d at 717, when Roth finally informed Bild, "[T]here's nothing else I can do for you." Tr. 118. This conversation occurred in May 2009. Thereafter, Bild should have known then that Konig might not repay him despite the March 2007 Agreement. The question is thus whether Bild was duly diligent in bringing suit despite the seven-month delay between May 2009 and December 21, 2009. See Harkin, 554 N.Y.S.2d at 480.

In Simcuski, the New York Court of Appeals provided the following guidance on the due diligence inquiry:

> Whether in any particular instance the plaintiff will have discharged his responsibility of due diligence in this regard must necessarily depend on all the relevant circumstances. The length of the legislatively prescribed period of limitations is sometimes said to be relevant, and courts have held that in no event will the plaintiff be found to have exercised the required diligence if his action is deferred beyond the date which would be marked by the reapplication of the statutory period, i.e., that the length of the statutory period itself sets an outside limit on what will be regarded as due diligence.

377 N.E.2d at 717. Simcuski involved a medical malpractice action for which the statute of

limitations was three years. See id. at 715. Although the plaintiff's injury occurred in October 1970, she did not bring suit until April 1976. Id. However, the plaintiff alleged that she was tardy only because the defendant doctor had concealed his responsibility for her injury; plaintiff asserted that she did not learn of the defendant's culpability until October 1974. Id. On the basis of these allegations, the New York Court of Appeals concluded that "such an outside limit [of three years for a medical malpractice suit] was not exceeded; the action was brought less than three years after discovery [of the defendant's misrepresentation] in 1974." Id. at 717.

Pursuant to Simcuski and its progeny, see, e.g., City of Syracuse v. Loomis Armored US, LLC, No. 5:11-cv-744 (MAD/TWD), 2012 WL 4491119, at *14 (N.D.N.Y. Sept. 28, 2012); Weizmann Inst. of Sci. v. Neschis, 421 F. Supp. 2d 654, 684-85 (S.D.N.Y. 2005); Lennon v. Seaman, 63 F. Supp. 2d 428, 442 (S.D.N.Y. 1999); Campbell v. Chabot, 592 N.Y.S.2d 423, 424 (App. Div. 1993); Atkins & Durbrow, Ltd. v. Home Indem. Co., 444 N.Y.S.2d 285, 287 (App. Div. 1981), the six-year statute of limitations for breach-of-contract actions provides a point of reference for assessing whether Bild diligently brought suit after learning that Konig might not repay him despite the March 2007 Agreement. The seven-month period between May 2009, when Bild had his final conversation with Roth, and December 21, 2009, when plaintiff filed suit, nowhere approaches the "outside limit," Simcuski, 377 N.E.2d at 717, of six years.

In addition, the court concludes that Bild took reasonable steps to prepare for litigation immediately after Roth suggested that the arbitration had fallen through. On May 19, 2009, Bild wrote a letter to Roth mentioning the possibility of a lawsuit and asking for a copy of the March 2007 Agreement—presumably to obtain written documentation that Konig had agreed to repay plaintiff, since Roth had previously refused to give him a copy of the agreement. And, although he received no response from the arbitrator, Bild made final efforts to resolve the matter through

51

Wieder and Friedman. Thereafter, in mid-2009, Bild learned that his efforts were in vain when Wieder claimed that Bild could no longer recover on the loan because the statute of limitations for suing had expired. Given the unexpected turn of events—after reasonably believing for nearly ten years that he would be repaid without litigation—Bild was hardly tardy when he discussed the case with Bandklayder in September 2009 and then commenced suit three months later.

Here, particularly in light of the extensive facts demonstrating Weider's culpability for the delay, see Overall, 52 F.3d at 404 (instructing that courts should "determine the [parties'] relative blameworthiness in delaying the commencement of suit"), the court is persuaded that Bild timely brought suit "after the facts giving rise to the estoppel have ceased to be operational," Simcuski, 377 N.E.2d at 717. Compare Talarico v. Thomas Crimmins Contracting Co., No. 94 CIV. 0420 (RPP), 1997 WL 30940, at *3 (S.D.N.Y. Jan. 24, 1997) (concluding that defendants were estopped from asserting the six-year statute of limitations in a breach-of-contract action, where plaintiff delayed for only "several months" after "rel[ying] on the promise of [defendant] for years"), and Simcuski, 377 N.E. 2d at 715-717 (holding that, in a medical malpractice action involving a three-year statute of limitations, plaintiff was not precluded from invoking equitable estoppel although she did not bring suit until over two years after "the facts giving rise to the estoppel . . . ceased to be operational"), and Harkin, 554 N.Y.S.2d at 480 ("[W]e have no trouble in holding that plaintiff's service of a summons and complaint on [defendant] on June 19, 1985, 2 1/2 months after expiration of the [2 1/2 year] statute of limitations, constituted due diligence as a matter of law, assuming that plaintiff, as he asserts, first learned that the tumor was benign only 6 1/2 months before, on December 5, 1984."), with Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd., 311 B.R. 378, 394 (S.D.N.Y. 2004)

(barring plaintiff from invoking equitable estoppel where he "had over three years remaining before the statute of limitations foreclosed a breach of contract claim" at the time that he learned of the defendant's breach and where plaintiff "appears to have made a calculated decision not to enforce its claim during that time"), and McIvor v. Di Benedetto, 503 N.Y.S.2d 836, 838-39 (App. Div. 1986) (holding that defendants were not estopped from raising the two-year statute of limitations, where the initial plaintiff withheld suit for over two years after acquiring knowledge that eliminated the reasonableness of her reliance on defendants' misrepresentations), and Kotlyarsky v. N.Y. Post, 757 N.Y.S.2d 703, 706-08 (Sup. Ct. 2003) (concluding that defendants were not estopped from asserting the one-year statute of limitations in a libel action, where plaintiff delayed for nine months before attempting to ascertain whether a defendant had followed through on her promise to retract the allegedly libelous article).

* * *

In sum, the court concludes that plaintiff has established each of the elements of equitable estoppel under New York law by clear and convincing evidence.

## C.   Unclean Hands

Finally, Wieder maintains that the doctrine of "unclean hands" prevents plaintiff from invoking equitable estoppel, insofar as plaintiff failed to report as taxable income the $3 million that he used to fund the loan and failed to disclose to the IRS his ownership of the two foreign corporations that he used to fund $1.4 million of the loan. Dkt. #276.

It is true that "New York courts have long applied the maxim that one 'who comes to equity must come with clean hands.'" PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004) (quoting Amarant v. D'Antonio, 602 N.Y.S.2d 837, 838 (App. Div. 1993). At the same time, the Second Circuit has unambiguously interpreted New York law to limit that

53

doctrine in the following way: "Courts apply the maxim requiring clean hands where the party

asking for the invocation of an equitable doctrine has committed some unconscionable act that is

'directly related to the subject matter in litigation' and has injured the party attempting to invoke

the doctrine.'" Id. (quoting Weiss v. Mayflower Doughnut Corp., 135 N.E.2d 208, 210 (N.Y.

1956)); see also Havana Club Holding, S.A. v. Galleon, S.A., No. 96 Civ. 9655 (SAS), 1998

U.S. Dist. LEXIS 4065, at *18 (S.D.N.Y. Mar. 31, 1998) ("[W]hat is material is not that the

plaintiff's hands are dirty, but that [it] dirtied them in acquiring the right [it] now asserts, or that

the manner of dirtying renders inequitable the assertion of such rights against the defendants.")

(alterations in original) (internal quotation marks omitted).  In accordance with that limitation,

"'[i]f a plaintiff is not guilty of inequitable conduct toward the defendant in the transaction, his

hands are as clean as the law requires.'" Frymer v. Bell, 472 N.Y.S.2d 622, 625 (App. Div.

1984) (quoting Brown v. Lockwood, 432 N.Y.S.2d 186, 192 (App. Div. 1980)); accord Nat'l

Distillers & Chem. Corp. v. Seyopp Corp., 214 N.E.2d 361, 362 (N.Y. 1966) (holding that the

doctrine of unclean hands "is never used unless the plaintiff is guilty of immoral, unconscionable

conduct and even then only when the conduct relied on is directly related to the subject matter in

litigation and the party seeking to invoke the doctrine was injured by such conduct") (internal

quotation marks omitted); Kopsidas v. Krokos, 742 N.Y.S.2d 342, 344 (App. Div. 2002)

(declining to apply the doctrine of unclean hands where "the record failed to establish that the

defendants were injured" by plaintiff's alleged misconduct).

Relying on a number of New York cases relating to fraudulent conveyance, see Dkt.

#276, at 6-9 (citing Holland v. Ryan, 762 N.Y.S.2d 740 (App. Div. 2003); Farino v. Farino, 450

N.Y.S.2d 593 (App. Div. 1982); Festinger v. Edrich, 799 N.Y.S.2d 381 (Sup Ct. 2005); Palumbo

v. Palumbo, 284 N.Y.S.2d 884 (Sup. Ct. 1967); Jennings v. Foremost Diaries, Inc., 235 N.Y.S.2d

566 (Sup. Ct. 1962)), Wieder insists that he is entitled to invoke the doctrine of unclean hands

without a showing that he was injured by Bild's tax improprieties. However, to the extent that

the fraudulent conveyance cases constitute an exception to the rule articulated above, this case

does not fall within that limited exception.[15] Under the fraudulent conveyance cases, "where a

plaintiff transfers property to a defendant . . . in order to defeat the interests of a third party, such

as possible claims of creditors, a showing that the defendant was actually injured by plaintiff's

conduct is not required." Festinger, 799 N.Y.S.2d at 385 (emphasis added). Here, the court

finds that Bild did not make the loan to Wieder "in order to," id., to deprive the IRS of right to

collect taxes on the $3 million used to fund the loan. Accordingly, the loan was not itself a

fraudulent conveyance, and Wieder must show that he was injured by Bild's tax improprieties

before he can invoke the doctrine of unclean hands.

Defendant can make no such a showing. Wieder was not injured by Bild's failure to

report the $3 million to the IRS. On the contrary, defendant benefitted from receiving that

money, as it allowed him to buy out his partners in Vanderveer. "While the Court agrees that the

manner in which [plaintiff] reported its income . . . to the IRS [is] highly questionable, at best,

and very possibly criminal, [defendant] was not harmed by such filings." Fine-Cut Diamonds

Corp. v. Shetrit, No. 1283/06, 2009 WL 264122, at *5 (N.Y. Sup. Ct. Feb. 3, 2009). "In the final

analysis, this defense is little more than the pot calling the kettle black," id., and the court

concludes that Wieder is not entitled to invoke the doctrine of equitable estoppel to prevent Bild

from recovering on the loan. See Dinerstein v. Dinerstein, 300 N.Y.S.2d 677, 678-79 (App. Div.

1969) (holding that defendant was not entitled to invoke the doctrine of unclean hands to prevent

plaintiff from recovering on a "a valid and enforceable partnership agreement," even where

---

[15] The court assumes that the Second Circuit was aware of the fraudulent conveyance cases when it announced its
interpretation of the New York doctrine of unclean hands in PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488.

plaintiff may have engaged in "[i]ncidental or collateral illegality" by evading income taxes on the cash sales and profit made pursuant to the partnership agreement); Fine-Cut Diamonds Corp., 2009 WL 264122, at *5 (barring defendant from invoking the doctrine of unclean hands to preclude plaintiff from recovering on a contract involving the sale of diamonds despite plaintiff's "failure to properly report currency transactions on IRS form 8300 and inaccuracies noted in [plaintiff's] 2004 amended tax return and 2005 tax return") (internal citations omitted).

### III. CONCLUSION

Based on the foregoing, Wieder is equitably estopped from asserting the statute of limitations defense to Bild's action for breach of the Loan Agreement and accompanying Promissory Note. The court therefore concludes that Wieder is liable to Bild for: (1) the entire $3 million principal balance on the loan; (2) simple interest calculated at an annual rate of eleven percent, Pl.'s Ex. 2, at 1, from December 31, 1998, to December 31, 1999; (3) simple interest calculated at an annual rate of fifteen percent, Pl.'s Ex. 1, at 1, from January 1, 2000, to the date of judgment; and (4) "all costs of collection, including reasonable attorney's fees," id. at 2. The Clerk shall enter judgment for plaintiff in the amount of $3 million plus interest as described above. In addition, the matter shall be referred to Magistrate Judge Pohorelsky to determine the appropriate amount of costs and fees to be awarded.

SO ORDERED.

s/ ARR

_____

Allyne R. Ross
United States District Judge

Dated:          May 14, 2013
                Brooklyn, New York

56